# United States Court of Appeals

## For the First Circuit

No. 10-1965

SANDY J. BATTISTA,

Plaintiff, Appellee,

v.

HAROLD W. CLARKE, Commissioner of the Massachusetts
Department of Correction, and MICHAEL CORSINI,
Superintendent of Massachusetts Treatment Center,

Defendants, Appellants.

_____

KATHLEEN M. DENNEHY; ROBERT MURPHY; STEVE FAIRLY; SUSAN J.
MARTIN; GREGORY J. HUGHES; UMASS CORRECTIONAL HEALTH PROGRAM;
TERRE MARSHALL,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Boudin, Circuit Judge,
Souter,[*] Associate Justice,
and Stahl, Circuit Judge.

Richard C. McFarland, Legal Division, Department of
Correction, with whom Nancy Ankers White, Special Assistant
Attorney General, was on brief for appellants.
Neal E. Minahan, with whom Christopher D. Man and McDermott
Will & Emery LLP were on brief for appellee.

_____

[*]The Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

May 20, 2011

**BOUDIN**, <u>Circuit Judge</u>.    In 1983, in state court in Massachusetts, Sandy Battista (born "David Megarry") was convicted of the rape of a child, robbery, and kidnapping.  After serving that sentence, Battista was involuntarily committed in 2003 in a civil proceeding, Mass. Gen. Laws ch. 123A, § 14 (2008), to the Massachusetts Treatment Center for Sexually Dangerous Persons ("Treatment Center").  Such persons are held civilly without limit in time until adjudged safe for release.  <u>Id.</u> §§ 9, 14.

The Treatment Center, for which the Massachusetts Department of Correction ("the Department") is responsible, Mass. Gen. Laws ch. 123A, § 2, is an all-male facility housing three groups: criminals participating in treatment programs, civilly committed residents, and those awaiting adjudication as "sexually dangerous persons."   Massachusetts law requires that civil detainees like Battista be separated from criminal ones.  <u>Durfee</u> v. <u>Maloney</u>, Nos. CIV. A. 98-2523B, CIV. A. 98-3082B, 2001 WL 810385, at *15 (Mass. Super. Ct. July 16, 2001).

Battista is anatomically male but suffers from "gender identity disorder" ("GID"), a psychological condition involving a strong identification with the other gender.  GID is a disorder recognized in the American Psychiatric Association's <u>Diagnostic and Statistical Manual of Mental Disorders</u> (4th ed. 1994).   The diagnostic criteria include not only "cross-gender identification" but also "clinically significant distress or impairment in social,

occupational, or other important areas of functioning." Id. at 537-38.

In 1996, Battista changed her name to Sandy and began to seek treatment from the Department, including administration of female hormones and access to female garb. Her early demands were met with skepticism and resistance.[1] In 1997, a Department consultant diagnosed her GID, but the Department offered no further evaluation or treatment until 2004. Prior to this case, Battista filed two suits seeking GID treatment and accumulated expert opinions confirming the seriousness of her condition and recommending accommodations including hormone therapy.

Battista filed her complaint in the present suit in July 2005 and in October 2005 sought to castrate herself with a razor blade. The suit, against various officials of the Department, charged deliberate indifference to her medical needs in violation of the Eighth and Fourteenth Amendments and 42 U.S.C. § 1983 (2006), as well as state law, including Mass. Gen. Laws ch. 12, §§ 11H-11I. In particular, Battista sought an injunction requiring that hormone therapy and female garb and accessories be provided to her.

---

[1]In response to Battista's initial requests, a Department psychiatric consultant stated in 1997 that the name change and desired treatments were "bizarre at best, and psychotic at worst" and recommended various medical and psychological testing, as well as therapy. The consultant also considered Battista's requests to be "elective procedures" equivalent to "tummy tucks and liposuctions."

In and around 2005 and 2006, the Department fenced with its own healthcare provider, the University of Massachusetts Correctional Health Program, which offered strong support for the GID diagnosis, asserted that harm could easily occur without adequate treatment, and recommended hormone therapy as medically necessary. The Department instead hired another gender specialist, who then agreed that hormone treatment might be appropriate along with other therapy.

Battista's first request to the district court for a preliminary injunction was denied in March 2006, with a finding that the defendants had not at this stage been shown to be deliberately indifferent to her medical needs. Battista v. Dennehy, No. 05-11456-DPW, 2006 WL 1581528, at *9-10, *12 (D. Mass. Mar. 22, 2006). After the further medical assessments continued to recommend hormone therapy, the Department stated that it would not implement treatments until security concerns were further evaluated. This proved to be a drawn-out process.

In August 2008, the first security review by the Department concluded that a feminine appearance would endanger Battista. The core security concern throughout has been that sexual contacts or assaults by other detainees would be made more likely by female clothing and accessories and the enhancement of breasts due to hormone therapy. The report, however, was fairly cursory, comprising only a few paragraphs, and in December 2008 the

-5-

district court entered a preliminary injunction requiring psychotherapy, access to women's attire and accessories, monthly reports on Battista's condition, and a recommendation on hormone therapy after a six-month review.

In the six-month report, the doctors again prescribed the hormones. A first dose was administered, but then the Department put another indefinite hold on treatment pending a second security review. The September 2009 review again found the safety risk too high. This new report was more substantial although it more or less duplicated an earlier report prepared for an inmate who also had requested and been denied hormone therapy. Its security evaluation is at the core of the Department's substantive objection to hormone therapy for Battista.

Although hormone therapy had been provided for GID to inmates of some male prisons, the September 2009 report included data gathered under the Prison Rape Elimination Act of 2003 ("PREA") § 4, 42 U.S.C. § 15603, to argue that the risk of sexual assault was higher at the Treatment Center as compared to other facilities of the Department, including prisons. The report noted that Treatment Center residents were sex offenders and that the Treatment Center had an open floor plan. It stressed Battista's past infractions and the inability to move her to another facility because of her civil commitment status.

A bench trial took place in June and August 2010. In the course of the trial, Battista offered an evaluation from psychiatrist George Brown. He testified that Battista was eligible and ready for hormonal treatment, that the past treatment for her GID "falls below any reasonable standard of care," and that with a

> high degree of medical certainty . . . when this patient loses hope again regarding access to appropriate care, she will engage in surgical self-treatment by autocastration or will hire someone to do this for her. This could lead to an inadvertent death due to exsanguination.

On August 3, 2010, the court stated that it would enter a modified preliminary injunction order requiring hormone therapy to begin shortly. On August 23, 2010, the district court delivered a detailed oral decision, which recounted the history and made numerous findings in support of its injunction, applying the usual four-part test for preliminary relief, Iantosca v. Step Plan Svcs., Inc., 604 F.3d 24, 29 n.5 (1st Cir. 2010) (likelihood of success, irreparable harm, balance of hardships on the opposing sides, public interest).

In its decision, the district court unqualifiedly required hormone therapy.[2] The injunction is styled as preliminary

---

[2]The modified preliminary injunction now on appeal was issued on August 23, 2010, and requires "[w]ithin seven (7) business days of the entry of this Order, the DOC shall provide hormone therapy to Battista in accordance with the recommendation of Dr. Levine, Dr. Zakai, and Ruth Khowais, Psy.D. on June 19, 2009, and the prescription by endocrinologist Dr. Mohammed Saad dated August 4, 2009 and August 14, 2009."

because both sides sought a ruling on implementation issues-- specifically, how restricted Battista may be in her confinement-- which the district court now has under consideration; but hormone therapy has now been definitively decreed. That directive was stayed by the district court pending appeal, as defendants requested, solely because the district court feared harm to Battista if hormone therapy were begun and later stopped again.

The district court's ultimate finding of "deliberate indifference" rests on several different subordinate findings, which can be recast and summarized under two headings: first, that Battista has an established medical need for hormone therapy, may suffer severe harm without it, and (implicitly) that such therapy is feasible despite safety concerns; and second, that the defendants' reliance on their administrative discretion in invoking and dealing with security concerns has been undercut by a collection of pretexts, delays, and misrepresentations.

The focus of this appeal is narrow. The Department concedes that Battista suffers from GID and needs treatment and that hormone therapy has been recommended as medically necessary; but it says that security concerns reasonably underpin its refusal and contests the finding of deliberate indifference. Because the individual defendants are sued only in their official capacity for injunctive relief and no damages are sought, qualified immunity is

not an issue nor need the separate roles of individual defendants be sorted out.[3]

Defendants suggest that review is <u>de novo</u>; the plaintiff, that it is essentially for abuse of discretion in the grant of preliminary relief. In truth, the standard of review varies depending on the precise underlying issue in the mosaic of arguments and counter-arguments. Legal issues are open to <u>de novo</u> review, factual findings are reviewed for clear error, and judgment calls by the district judge may get deference depending on the circumstances. <u>Venegas-Hernández</u> v. <u>Asociación de Compositores y Editores de Música Latinoamericana (ACEMLA)</u>, 424 F.3d 50, 53 (1st Cir. 2005).

The <u>substantive</u> standard for liability is a more complicated story. In the district court, the parties and the judge focused on the Eighth Amendment test used to assess medical care, or the lack of it, for criminal prisoners, namely, whether the defendants were "deliberately indifferent" to the needs of their charge. <u>Farmer</u> v. <u>Brennan</u>, 511 U.S. 825, 837 (1994); <u>Estelle</u> v. <u>Gamble</u>, 429 U.S. 97, 104-05 (1976). This choice of tests was hardly surprising: although protection of civilly committed persons

---

[3]In the district court, Battista asserted but then abandoned earlier damage claims and focused her suit on forward-looking injunctive relief. Had this appeal involved individual liability for damages and qualified immunity, a different outcome could easily have been possible as to such claims.

rests on due process concepts rather than the Eighth Amendment, deliberate indifference is the familiar test for medical care.

The Eighth Amendment standard is in part one of subjective intent. Farmer, 511 U.S. at 839-40. The phrasing itself implies at least a callous attitude, but subjective intent is often inferred from behavior and even in the Eighth Amendment context--contrary to the defendants' assertion--a deliberate intent to harm is not required. Id. at 835. Rather, it is enough for the prisoner to show a wanton disregard sufficiently evidenced "by denial, delay, or interference with prescribed health care." DesRosiers v. Moran, 949 F.2d 15, 19 (1st Cir. 1991).

Because Battista is civilly committed, a different, more plaintiff-friendly standard arguably applies here: whether the defendant failed to exercise a reasonable professional judgment. Youngberg v. Romeo, 457 U.S. 307, 321 (1982).[4] Battista has repeatedly invoked a due process standard and claimed it to be more favorable but does not pinpoint the Youngberg formulation. However, fine-tuning is unnecessary. The two standards are not all

---

[4]The decisions are not uniform. Compare Ketchum v. Marshall, No. 90-F-1627, 963 F.2d 382, 1992 WL 111209, at *2 (10th Cir. 1992) (unpublished table decision) (using deliberate indifference test for medical care for the civilly committed without mentioning Youngberg), with Patten v. Nichols, 274 F.3d 829, 833-42 (4th Cir. 2001) (applying professional judgment test, not deliberate indifference), with Sain v. Wood, 512 F.3d 886, 894-95 (7th Cir. 2008) (treating both standards as equivalent to deliberate indifference), and Ambrose v. Puckett, 198 F. App'x 537, 539-40 (7th Cir. 2006) (treating both standards as equivalent to professional judgment).

-10-

that far apart and, to the extent that the Youngberg phrasing governs and is more helpful to Battista, that only reinforces the outcome reached by the district judge.

Both the Farmer and Youngberg tests leave ample room for professional judgment, constraints presented by the institutional setting, and the need to give latitude to administrators who have to make difficult trade-offs as to risks and resources. This is a regular theme in the Eighth Amendment cases, Farmer, 511 U.S. at 844, and it is equally important under Youngberg. There, while stressing that civilly committed persons are entitled to an extra margin of protection, the Court also stated that there can be more than one reasonable judgment, and that the choice in such cases is for the professional. 457 U.S. at 321, 324-25.

Finally, while an "intent to punish" is not required even under Farmer, it could certainly be highly significant under Farmer and, a fortiori, under Youngberg. So it is useful to dispose at the outset of plaintiff's claim that Robert Murphy--the superintendent of the Treatment Center--admitted that whether Battista should "be punished for her lack of good judgment by withholding medical care" was "a consideration" when Murphy wrote the security report rejecting hormone therapy.

This overreads Murphy's testimony. That Battista had regularly evaded Treatment Center restrictions and engaged in sexual contacts with other detainees was fully established, and it

-11-

enhanced the danger to her in the future if her attractiveness to other detainees was increased. So that fact was legitimately a "consideration" that could affect whether hormone treatment could be safely allowed. The term "punish" was not Murphy's own but was inserted into the question itself by Battista's counsel during the deposition:

> Q: Should Battista be punished for her lack of good judgment by withholding medical care?
>
> A: That's a consideration, yes.

However, even without an evil motive, the district court could reasonably find that there had been "denial," "delay" and "interference" under Eighth Amendment precedent and that a reasonable professional judgment had not been exercised under Youngberg. It has been fifteen years since Battista first asked for treatment, and for ten years, health professionals have been recommending hormone therapy as a necessary part of the treatment. When during the delay Battista sought to mutilate herself, the Department could be said to have known that Battista was in "substantial risk of serious harm." Farmer, 511 U.S. at 847.

But the question remains whether the withholding of hormone therapy was "wanton" or outside the bounds of "reasonable professional judgement." Medical "need" in real life is an elastic term: security considerations also matter at prisons or civil counterparts, and administrators have to balance conflicting

-12-

demands.  The known risk of harm is not conclusive: so long as the balancing judgments are within the realm of reason and made in good faith, the officials' actions are not "deliberate indifference," Farmer, 511 U.S. at 844-45, or beyond "reasonable professional" limits, Youngberg, 457 U.S. at 321, 324-25.

Here, despite much early resistance, Brugliera v. Comm'r of Mass. Dep't of Corr., No. 07-40323-JLT (D. Mass. Dec. 18, 2009); Kosilek v. Maloney, 221 F. Supp. 2d 156, 159-60 (D. Mass. 2002), hormone therapy for GID is now provided in some cases in Massachusetts prisons.  The defendants point to this to establish their good faith; Battista, to show that providing her the therapy would be consistent with security needs.  Both positions are overstated.  Hormone therapy has not been welcomed by the Department, but both the Treatment Center's internal environment and Battista herself arguably presented added risks.

The Treatment Center is the one facility where Battista can be housed as a civil inmate and, while the Department could establish a branch elsewhere, Mass. Gen. Laws ch. 123A, § 2, this would pose administrative difficulties and be isolating for Battista.  The civil-side residents of the Treatment Center contain a disproportionate number of male sex offenders who might threaten one who presents herself as female.  And Battista has a record of infractions and sexual contacts and risk-taking that colorably place her at greater risk from invited or uninvited sexual contact.

-13-

Nor is Battista's willingness to take risks for herself decisive. The defendants have an obligation to take reasonable measures to protect inmates, Farmer, 511 U.S. at 833 (quoting Cortes-Quinones v. Jimenez-Nettleship, 842 F.2d 556, 558 (1st Cir.), cert. denied, 488 U.S. 823 (1988)), and Battista is quite likely to sue if preventable harm occurs. Battista will bear some of the risk of the hormone therapy, but not all of it. And, while she could be kept in protective custody available at the Treatment Center, this custody--as currently structured--involves confinement for most of the day and other disadvantages that Battista is unwilling to tolerate.

The legal labels applied to facts are reviewed on appeal more closely than a district court fact-finding, but often with some deference to the district judge. United States v. Quiñones-Medina, 553 F.3d 19, 22 (1st Cir. 2009). Yet this would be a much harder case if defendants had proffered a persuasive and untainted professional judgment that--while hormone therapy would help Battista--the dangers, security costs and other impediments made it infeasible. For the problem is not one of callous guards or inept medical care but of conflicting considerations. As we said in an earlier case involving the Treatment Center:

> Any professional judgment that decides an issue involving conditions of confinement must embrace security and administration, and not merely medical judgments. . . . The administrators are responsible to the state and to the public for making professional

-14-

> judgments of their own, encompassing
> institutional concerns as well as individual
> welfare. Nothing in the Constitution
> mechanically gives controlling weight to one
> set of professional judgments.

Cameron v. Tomes, 990 F.2d 14, 20 (1st Cir. 1993).

Yet in this instance, as the record now stands, the defendants have forfeited the advantage of deference. Initially, the district judge was far from anxious to grant the relief sought. It was only after what the judge perceived to be a pattern of delays, new objections substituted for old ones, misinformation and other negatives that he finally concluded that he could not trust the defendants in this instance. The details are laid out in his oral opinion and the record contains support for his conclusion. Several examples stand out.

First, for some time, the Department refused to take the GID diagnosis and request for hormone therapy seriously. Its representatives resisted it in other cases, and when their own medical advisers supported the request for Battista, the defendants went back and forth apparently looking for an out. It may take some education to comprehend that GID is a disorder that can be extremely dangerous. But the education seems to have taken an unduly long time in this instance, especially in light of the self-mutilation attempt.

Second, once the medical prescription was clear, several years passed before the defendants produced a substantial security

justification; and this, it turns out, depended in part on inaccurate data in paragraphs largely written by Department counsel and inserted at counsel's request <u>after</u> Murphy had made his decision and submitted his initial draft. Murphy admitted in his trial affidavit that he had miscounted the PREA incidents in 2007 and 2008; there were really 41, not 68, reported incidents at the Treatment Center.

Third, for some time, the defendants portrayed the choice facing the court as one between keeping Battista in a severely constraining protective custody unit and denying her hormone therapy. Defendants now show some signs of retreating from this all or nothing choice,[5] but not far: this is consistent with a pattern of slow retreats to the next redoubt. The district court may well be right that a detailed solution will be developed only when the choice is forced on defendants.

In the end, there is enough in this record to support the district court's conclusion that "deliberate indifference" has been established--or an unreasonable professional judgment exercised-- even though it does not rest on any established sinister motive or "purpose" to do harm. Rather, the Department's action is undercut

---

[5]Finally faced with a decision by the district court to require therapy, defendants now say they have offered to create a modified protective custody arrangement that would provide Battista and others with both protection from other residents and "access to treatment, work, educational programs, and recreation." This may on investigation be less than the quotation suggests but that is another matter.

-16-

by a composite of delays, poor explanations, missteps, changes in position and rigidities--common enough in bureaucratic regimes but here taken to an extreme. This, at least, is how the district court saw it, and it had a reasonable basis for that judgment.

There are a few loose ends to address. One is that the defendants say that the harm faced by Battista is neither immediate nor irreparable--common requisites for preliminary relief--but, as already noted, the injunction is not preliminary as to her entitlement to hormone therapy. And while the risk of self-mutilation is unpredictable, it grows as the litigation drags on. They also say that the risk of physical assault will be increased by therapy, which may be so but is not decisive: medical treatment often poses risks and invites trade-offs.

Another set of defendant arguments is contained only in the reply brief. These include a claim that the decision is inconsistent with the court's earlier denial of relief. This claim, perhaps imprudently, draws attention to the experience with the Department gained by the district court after that denial. Anyway, claims first raised only in reply briefs are forfeit, Rivera-Muriente v. Agosto-Alicea, 959 F.2d 349, 354 (1st Cir. 1992), and we note only that none of them appear promising even if they had been preserved.

Affirmed.