TORRUELLA, Circuit Judge,
Dissenting.
Lest we lose sight of the rule that we are called upon to enforce, stretching it beyond the bounds of its intended purpose, it is perhaps appropriate to begin by reciting the text of the Eighth Amendment: “Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.” U.S. Const, amend. VIII. In applying any rule, precise demarcation of its reach is both appropriate and necessary. Where these boundaries are ignored, the results are most often unforeseen, unintended, and unwarranted. It is only through careful attention to the countervailing interests that prescribe the sweep of a rule that we are best able to identify both those situations that fall clearly within its bounds, and those complexities that skirt along its outermost edges. Such limitations serve more than an exclusionary purpose; by establishing a rule’s proper scope, they ensure the effectiveness of its protections when correctly and adeptly applied.
With due respect to the majority, I am forced to dissent because I cannot support what is, in my view, an outcome that proceeds with little recognition of such boundaries. Instead, it allows to stand a decision that, finding its foundation in several erroneous assumptions, reaches a result beyond the limits of our established Eighth Amendment jurisprudence.
I. Kosilek’s History and Treatment
Michelle Kosilek (“Kosilek”) is an anatomically male prisoner who suffers from severe gender identity disorder (“GID”). In 1992, Kosilek was convicted of murdering her[32] wife and sentenced to life imprisonment without the possibility of parole. While in prison, Kosilek legally changed her name from “Robert” to “Michelle” and began living as a woman to the extent possible within a male prison environment. Kosilek has previously sought legal redress for what she alleged were constitutional shortcomings in the Commonwealth of Massachusetts’s treatment of prisoners with GID. See Kosilek v. Maloney, 221 F.Supp.2d 156 (D.Mass.2002). Resolved in 2002, this litigation failed to substantiate any Eighth Amendment violations but ultimately contributed to changes in the care and treatment of GID prisoners, including Kosilek.
Today, the Massachusetts Department of Corrections (“DOC”) provides Kosilek with a bevy of ameliorative measures aimed at treating her GID. These measures, as recommended by the DOC’s medical advisors, include: psychotherapy, hormone therapy, electrolysis for facial hair removal, and access to female clothing and personal items (including underwear and cosmetics) such as those provided to inmates at MCI-Framingham, Massachusetts’s only female prison. The DOC’s medical providers, Kosilek’s psychiatrist, and Kosilek herself testified as to the positive impact these measures have had on her mental state and self-esteem.
*774 Nonetheless, the district court, validated by the majority in this appeal, has now ordered that the DOC provide Kosilek with sex reassignment surgery (“SRS”) to change her male sex organs to female. According to the district court, this surgery is the only adequate medical treatment for the serious risk posed by Kosi-lek’s GID; although Kosilek is not now suicidal, a failure to provide the surgery could result in the deterioration of her mental state and the potential for future self-harm.[33] Consequently, in the district court’s mind, any other treatment — namely, the continued provision of psychotherapy, hormonal treatments, and female attire, in addition to treating any potential suicidality through antidepressants and increased therapy — is violative of the Eighth Amendment.
II. The Eighth Amendment
Fundamental to our understanding of criminal sentencing and penological standards is the requirement that “cruel and unusual punishments [not be] inflicted” upon those convicted of a crime. U.S. Const, amend. VIII. In adopting this prohibition, “Americans ... feared the imposition of torture and other cruel punishments not only by judges acting beyond their lawful authority, but also by legislatures engaged in making the laws by which judicial authority would be measured.” Ingraham v. Wright, 430 U.S. 651, 665, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) (citing Weems v. United States, 217 U.S. 349, 371-73, 30 S.Ct. 544, 54 L.Ed. 793 (1910)).
Later courts made apparent that the Eighth Amendment’s restrictions on criminal punishment also governed the treatment to which prisoners were entitled when they became sick or injured while in custody. After all, where “society takes from prisoners the means to provide for their own needs[,] ... [a] prison’s failure to provide sustenance [and care] for inmates may actually produce physical ‘torture or [ ] lingering death.’ ” Brown v. Plata,—U.S.-, 131 S.Ct. 1910, 1928, 179 L.Ed.2d 969 (2011) (quoting Estelle v. Gamble, 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). The Eighth Amendment therefore proscribes medical care that does not rise to the level of “the evolving standards of decency that mark the progress of a maturing society.” Estelle, 429 U.S. at 102, 97 S.Ct. 285 (quoting Trap v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)).
That appropriate medical care must be provided does not, however, mean that inmates may seek and receive the care of their choosing. United States v. DeCo-logero, 821 F.2d 39, 42 (1st Cir.1987). Rather, this worthy pledge of protection is made practicable through the creation of a floor below which the standard of care must not fall. Prison officials commit no violation so long as the medical care provided is minimally adequate. See id.; Leavitt v. Corr. Med. Servs., Inc., 645 F.3d 484, 497 (1st Cir.2011) (stating that an Eighth Amendment violation occurs when the medical care provided is “so inadequate as to constitute an unnecessary and wanton infliction of pain or [is] repugnant to the conscience of mankind” (quoting Estelle, 429 U.S. at 105-06, 97 S.Ct. 285)). “[T]his obligation is met in full measure by the provision of ... services at a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards.” DeCologero, 821 F.2d at 43. This limit on the scope of the Eighth Amendment’s protection is clear: care need not be ideal, so *775 long as it is both diligent and within the bounds of prudence.
Neither do all instances of inadequate care constitute constitutional violations. To substantiate a constitutional claim there must be proof that the government was “deliberately indifferent” to this lack of treatment. See Battista v. Clarke, 645 F.3d 449, 452 (1st Cir.2011) (citing Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); Estelle, 429 U.S. at 104-05, 97 S.Ct. 285). A finding of deliberate indifference requires two showings. First, a prisoner must prove his or her medical need is objectively serious. Mahan v. Plymouth Cnty. House of Corr., 64 F.3d 14, 17-18 (1st Cir.1995). A serious medical need is “one that has been diagnosed by a physician as mandating treatment, or one that is so objectively obvious that even a lay person would easily recognize the necessity for a doctor’s attention.” Gaudreault v. Municipality of Salem, 923 F.2d 203, 208 (1st Cir.1990) (citations omitted). Second, a prisoner must prove subjective intent to deny care on the part of prison officials. Farmer, 511 U.S. at 837, 114 S.Ct. 1970 (reasoning that the Eighth Amendment’s prohibition of punishment means that it reaches only the intentional provision of inadequate medical care). Therefore, a prisoner must establish both that an official was “aware of facts from which [an] inference [of a substantial risk of serious harm] could be drawn” and that the official in fact drew the inference. Id. It follows that a showing of ordinary negligence is insufficient to establish a constitutional violation; deliberate indifference requires a level of obstinacy akin to criminal recklessness. Giroux v. Somerset Cnty., 178 F.3d 28, 32 (1st Cir.1999).
A final boundary delimiting the Eighth Amendment’s scope of protection is one founded in the recognition that “security considerations also matter at prisons ... and administrators have to balance conflicting demands.” Battista, 645 F.3d at 454. Therefore, deference is given to the reasonable judgments of prison officials “so long as [those] balancing judgments are within the realm of reason and made in good faith.” Id. Although prison officials may “forfeit[ ] the advantage of deference” when their stated rationales for the rejection of medically prescribed treatment are pretextual, id. at 455, an assessment of deliberate indifference must still “embrace security and administration, [ ] not merely medical judgments.” Cameron v. Tomes, 990 F.2d 14, 20 (1st Cir.1993).
III. Clear Error Review
It is beyond argument that our standard of review in cases such as this one falls upon a continuum, ranging from clear error for questions of pure fact, to de novo for questions of pure law. See, e.g., United States v. Mariano, 983 F.2d 1150, 1158 (1st Cir.1993). Moreover, resolving Kosi-lek’s claim certainly requires the careful and thorough consideration of innumerable factual findings, including the weighing and assessment of expansive testimony provided by both medical personnel and prison officials. That this element of our task includes a grant of deference to the district court is not in dispute.
Starting from this shared presumption, however, my path quickly diverges from that of the majority. Namely, I take issue with the majority’s conclusion that all issues in this case fall squarely on the factual end of our spectrum, and that, consequently, clear error review applies to all elements of the district court’s decision, including its ultimate conclusions. Recognizing, as the majority does, that our precedent is far from crystallized on the matter, see ante at 761, I would not be so quick to leave such legal determinations *776 bereft of searching appellate review.[34] Neither, I believe, is that the intended result of our standards.
At a minimum, our court should carefully apply a more critical eye to the district court’s distillation of factual findings into legal conclusions, reviewing those ultimate conclusions with significantly less deference. See, e.g., Hallett v. Morgan, 296 F.Bd 732, 744 (9th Cir.2002) (“The district court’s factual findings regarding conditions at the Prison are reviewed for clear error. However, its conclusion that the facts do not demonstrate an Eighth Amendment violation is a question of law that we review de novo.” (citing Campbell v. Wood, 18 F.3d 662, 681 (9th Cir.1994) (en banc)));[35] Alberti v. Klevenhagen, 790 F.2d 1220, 1225 (5th Cir.1986) (“[0]nce the facts are established, the issue of whether these facts constitute a violation of constitutional rights is a question of law that may be assayed anew upon appeal”). Any deference must also admit of exception where the trial court bases its findings on an “erroneous interpretation of the standard to be applied,” Vinick v. United States, 205 F.3d 1, 7 (1st Cir.2000) (quotation marks omitted) (quoting United States v. Parke, Davis & Co., 362 U.S. 29, 44, 80 S.Ct. 503, 4 L.Ed.2d 505 (I960)), for even under deferential review we have a duty to “look carefully ... to detect infection from legal error,” Sweeney v. Bd. of Trs. of Keene State Coll., 604 F.2d 106, 109 n. 2 (1st Cir.1979).
While recognizing that the delineation between questions of law and fact is often less than pristine, see, e.g., Miller v. Fenton, 474 U.S. 104, 113-14, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985), the inherent difficulty in our task cannot lead to the abdication of our responsibility to identify and strenuously review a district court’s conclusions of law, even where those conclusions are not easy to parse from their factual underpinnings. I cannot agree, therefore, with *777 the majority’s failure to undertake any inquiry more searching than that provided by clear error review.[36]
IV. The District Court’s Conclusions
In its review, the district court undertook to answer five distinct questions which, when answered in the affirmative, it found substantiated a constitutional violation deserving of remedy. These were: (1) whether Kosilek had a serious medical need; (2) whether SRS was the only adequate treatment for that need; (3) whether the DOC knew Kosilek was at high risk of serious medical harm absent SRS; (4) whether the DOC’s denial of treatment was made in bad faith or for pretextual reasons; and (5) whether the DOC’s conduct, if found to be unconstitutional, would continue in the future.
In my view, by parsing the issue into such discrete, hermetic questions, the district court’s opinion artfully shielded from review the complex and oft-interrelated nature of our Eighth Amendment inquiry. See Leavitt, 645 F.3d at 498 (“[T]he subjective deliberate indifference inquiry may overlap with the objective serious medical need determination; similar evidence, including evidence of adverse effects, may be relevant to both components.” (internal quotation marks and citation omitted)); DesRosiers v. Moran, 949 F.2d 15, 18-19 (1st Cir.1991) (recognizing that “[i]n practice” the objective and subjective components of our deliberate indifference standards “may overlap or merge”). In treating Kosilek’s contentions, therefore, I adopt our court’s past practice of assessing the district court’s “several subordinate findings” in a more holistic manner.[37] Battista, 645 F.3d at 452. This approach gives due recognition to the fact that “[mjedical need’ in real life is an elastic term,” id. at 454, and acknowledges that any determination of a treatment’s adequacy must carefully balance the many competing concerns faced by prison officials. I begin with a discussion of the district court’s errors, as I see them.
A. Prudent Medical Care
The district court faced a question about the practice of prudent medical professionals that, at its crux, hinged on whether the DOC’s preferred treatment plan — advocated by Dr. Schmidt — was a medically adequate response to Kosilek’s GID. Ultimately, the district court, in a decision now upheld by the majority, determined that Dr. Schmidt was not a prudent professional, based largely on his statements of equivocation regarding use of the Harry Benjamin Standards of Care (the “Standards of Care” or the “Standards”). Indeed, Dr. Schmidt testified that he viewed the Standards as “guidelines.” He also made clear that he found the protocol laid out on the Standards of Care “very useful *778 for patients,” and that he “referred] [patients] to the protocol and ask[ed] them to become familiar with them.” As to SRS, Dr. Schimdt stated that he “neither advocate[s] for nor ... speak[s] against the decision[ ].” Instead, he “leaves[s] the decision-making in the hands of the patients.” This is far from what the district court, now affirmed by the majority, characterizes as an outright rejection of the Standards’ applicability.
Still, the district court took particular issue with Dr. Schmidt’s practice of not writing letters of recommendation for patients seeking surgery. The district court’s concern was predicated on its belief that letters of recommendation are required by the Standards of Care, and “[a]ccordingly, prudent professionals ... write such letters.” Kosilek, 889 F.Supp.2d at 233. This reasoning contains an inferential leap. That there is a predicate requirement to a medical procedure does not lead inexorably to the conclusion that prudence mandates assisting patients to meet that requirement. For instance, if a surgery could not be conducted on an individual under a particular age without several letters of recommendation, a medical professional who refused to write such a letter based on their understanding of that treatment’s appropriateness for youths would not be, necessarily, imprudent.
In affirming the district court’s finding that Dr. Schmidt was not prudent, the majority also assigns significant weight to the fact that, despite having treated approximately 300 individuals with GID, Dr. Schmidt does not appear to believe surgery was ever “medically necessary.” The majority disparages this belief as clearly contrary to the Standards of Care, and therefore clearly imprudent.' Yet, again, Dr. Schmidt admits to using the standards for guidance and to “maintaining] a neutral position” on surgery. At the request of his patients, he also released medical files to surgeons and wrote letters indicating, where appropriate, that there were no contra-indications to surgery. His testimony regarding his disagreement that surgery was medically necessary stemmed from his belief that patients exhibiting particularly high levels of distress often suffer from co-morbid conditions that require treatment in their own right.
Moreover, the Standards of Care themselves admit of just this sort of flexible application, not simply strict adherence. The first page of the Standards of Care states unequivocally that, “[t]he Standards of Care are Clinical Guidelines; ” it continues on to make clear that the Standards are “intended to provide flexible directions” and that “[a]ll readers should be aware of the limitations of knowledge in the area.” Standards of Care at 1 (emphasis added). But see Kosilek, 889 F.Supp.2d at 236 (citing O’Donnabhain v. Comm’r, 134 T.C. 34, 45 (U.S.Tax Ct.2010)) (relying on O’Donnabhain’s rejection of any characterization of the Standards of Care as “guidelines” as imprudent). The Standards of Care further provide that “[i]ndividual professionals and organized programs may modify them.” Standards of Care at 2. This much was made clear in Dr. Levine’s testimony:
[T]he “Standards of Care” was a consensus document from people from seven different countries or something, you know, who come from different systems, and it was a political process that forged together a set of standards.... So “prudent” is a wonderful word, but it’s not like it has one simple definition.
In fact, Dr. Levine, who was an independent expert hired by the district court, expressly stated in his initial report that, while not popular, Dr. Schmidt’s view was within “prudent professional standards.” *779 In its opinion, however, the district court took significant pains to recast this finding, dismissing it as erroneous based on Dr. Levine’s purported refusal to testify, at least initially, as to how a medically prudent professional would act if all countervailing interests were set aside. In other words, the court required Dr. Levine to presume that a patient had fully met all the readiness criteria in the Standards of Care and faced no other extrinsic obstacles to surgery (such as money, safety, or external pressure). The district court then hung its hat on the fact that, “[eliminating these considerations and any security concerns, Dr. Levine opined that a prudent professional would not deny Kosilek sex reassignment surgery.” Kosilek, 889 F.Supp.2d at 235 (emphasis added).
Medical prudence, however, does not exist in a bubble, and a standard of minimal adequacy must inherently admit of conditions that are less than ideal. See Rhodes v. Chapman, 452 U.S. 337, 367, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) (Brennan, J., concurring) (“[C]ases are not decided in the abstract. A court is under the obligation to examine the actual effect of challenged conditions.... ”). In fact, Dr. Levine’s testimony recognizes just such nuance — even if the district court’s reading of it does not. Dr. Levine stated that while prudent professionals would not deny SRS to eligible individuals, “life, [and] reality” sometimes would. In those instances, prudent professionals “bring to bear” the same methods described by Dr. Schmidt to otherwise alleviate the individual’s symptoms of GID.[38]
Nonetheless, the district court suggested that portions of Dr. Levine’s testimony might be properly “disregard[ed]” based on the purported change in his opinion. Kosilek, 889 F.Supp.2d at 234 n. 15. I see no merit in this assertion, and moreover believe that it evidences the district court’s troublesome practice of rejecting testimony — even the testimony of an impartial, court-appointed expert — where it explored the very real nuances implicit in defining prudent care. For one, the reason for any such “change” is clearly evidenced in the record: the district court demanded it. For another, Dr. Levine’s testimony, even after he was admonished for undertaking an assessment recognizing the realities in which GID patients live, was not inconsistent.
He began, in his written report, by stating that Dr. Schmidt’s method, while not preferred, was prudent. In later testimony, after specifically predicating his statement with an acknowledgment that “the ‘Standards of Care’ [] have to be interpreted ... by the life of the environment in which Michelle Kosilek is going to live,” Dr. Levine again concluded that Dr. Schmidt’s proposed treatment was not “imprudent.” The following exchange then occurred:
*780 THE COURT: But is this an area in which you think prudent professionals can reasonably differ as to what is at least minimally adequate treatment for this condition?
[DR. LEVINE]: Yes, and do.
Therefore, in addition to finding no internal inconsistencies in Dr. Levine’s expert testimony, see Mitchell v. United States, 141 F.3d 8, 17 (1st Cir.1998), I disagree that he ever testified to Dr. Schmidt’s proposed method of care being outside professional standards. At his most negative, Dr. Levine stated that Dr. Schmidt’s proposal would be “uncompassionate” and “unpopular.” At his most mincing, he referred to Dr. Schmidt’s proposed method of care as “not exactly imprudent.”[39] As such, the district court’s proffered conclusion that Dr. Levine found Dr. Schmidt’s proposal unreasonable is unsupported by the record. Insofar as the majority now affirms the same, erroneous reading, I find their conclusion to be equally flawed.
B. Serious Risk
It is undisputed that surgery for Kosilek would be an appropriate option for treating her GID. This fact is far from determinative, however, of whether a choice not to provide the surgery gives rise to a deprivation of constitutional magnitude. See Cameron, 990 F.2d at 20 (finding that prison officials are not “bound to do what the doctors say is best ... even if the doctors are unanimous”). If an alternative short of surgery is still sufficient to address, with minimal adequacy, Kosilek’s medical need, no constitutional claim can arise. See DeCologero, 821 F.2d at 43.
The district court reasoned, however, that any treatment except surgery is necessarily inadequate, given that Kosilek’s medical providers testified to a likelihood that a denial of surgery would significantly increase Kosilek’s risk of severe emotional distress, potentially manifesting in self-harm. Moreover both the district court and majority rejected, as violative of the Eighth Amendment, the DOC’s plan to treat any symptoms of heightened distress and suicide ideation with additional psychotherapy and the possible use of antidepressants.
This conclusion rests on an artful — and in my mind erroneous — compartmentalization of the DOC’s preferred treatment plan. The district court seeks to draw a clear line between the cause of Kosilek’s distress (GID) and her symptoms (emotional distress and possible suicide ideation).[40] In support of the same reasoning, the majority cites a Seventh Circuit case for the proposition that “psychotherapy as well as antipsychotics and antidepressants ... do nothing to treat the underlying disorder [of GID].” See Fields v. Smith, 653 F.3d 550, 556 (7th Cir.2011). Critically, however, in Fields the prisoner was denied any hormonal treatment, meaning that the court was called on to resolve a question of whether psychotherapy and antidepressants alone could sufficiently treat GID. In contrast, here the question was whether the continued provision of all ameliorative measures currently afforded Kosilek in addition to antidepressants and *781 psychotherapy would be constitutionally adequate.
Indeed, the DOC’s proposed method of treating Kosilek’s distress and desire to self-harm cannot be assessed piecemeal, but must be addressed in light of Kosilek’s entire course of treatment. Were surgery not provided, the provision of psychotherapy, hormones, electrolysis, and female clothing and cosmetics would continue to represent a very real and direct treatment for Kosilek’s GID. Moreover, although she remains distressed, Kosilek admits that the DOC’s current treatment regimen has led to a significant stabilization in her mental state. Kosilek’s doctors testified to the same, highlighting her “joy around being feminized.” This claim is also borne out by the long passage of time since she exhibited symptoms of suicide ideation or attempted to self-castrate. The provision of additional, supplemental care specifically targeting her risk of suicide cannot, in my reading, render that treatment, which has successfully mitigated her symptoms for nearly a decade, suddenly inadequate.[41]
What is clear from the record is that the DOC has provided Kosilek with care sufficient to decrease her levels of distress and manage her desires to self-harm. On the whole, this suggested course of treatment appears tailored to Kosilek’s current symptoms and adequately prepared to address her future ones in a manner that is in no way “so inadequate as to shock the conscience.” Torraco v. Maloney, 923 F.2d 231, 235 (1st Cir.1991) (internal quotation marks omitted) (quoting Sires v. Berman, 834 F.2d 9, 13 (1st Cir.1987)); see also DeCologero, 821 F.2d at 43 (finding that care is adequate where it is “reasonably commensurate with modern medical science”).
C. Security Concerns
In issues of security, “[pjrison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.” Bell v. Wolfish, 441 U.S. 520, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Although we cannot “abdicate our responsibility to ensure that the limits imposed by the Constitution are not ignored,” Blackburn v. Snow, 771 F.2d 556, 562 (1st Cir.1985), we do not sit to substitute our own judgment for that of prison administrators. Nonetheless, believing that the DOC’s cited security concerns were mere pretext, the district court declined to afford them weight. Kosilek, 889 F.Supp.2d at 247. The majority affirmed this denial; a decision that I believe ignores the very real security issues presented by the DOC.
That various security concerns might arise in the context of a prison setting in which a post-operative, male-to-female transsexual is housed with male prisoners *782 takes no great stretch of the imagination.[42] In fact, nearly every case to consider the provision of medical care to prisoners at some point relies on the Supreme Court’s 1994 decision in Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In that case, an Eighth Amendment claim was predicated on prison officials’ failure to provide (in part through segregation) for the safety of a pre-opera-tive transsexual. Id. at 847, 114 S.Ct. 1970. The court reasoned that by knowingly allowing the petitioner to remain in general custody at a male prison despite his feminine body shape, clothing, and slight stature, prison officials could illustrate the sort of subjective indifference necessary to sustain an Eighth Amendment claim. Id.
Despite the obviousness of such risks, the majority reasons that no clear error occurred, in part because the DOC’s security review of MCI-Norfolk was started, completed, and submitted in a matter of weeks. With speed, it suggests, comes inadequacy. I am not so ready to adopt that presumption. The record shows that all involved parties met for the first time on May 19, 2005, to discuss a report that was due by May 27, 2005. That this was their first meeting, however, does not necessarily mean that it was the first instance in which the various individuals considered the issues and questions implicit in ensuring a safe environment for prisoners undergoing treatment for GID.
The district court and the majority also highlight the fact that experts retained by the DOC were not wholly knowledgeable about Kosilek’s personal characteristics, such as age and record of good behavior. Although this shortcoming in their knowledge was not ideal, I cannot credit any presumption that these lapses rendered the experts unable or unqualified to speak to the general security concerns created by housing a post-operative transsexual in a prison’s general population. Kosilek’s record of good behavior, for instance, has no bearing on an assessment of whether other prisoners might threaten or harm her based on her post-operative anatomy and gender presentation.
Further, in reaching its conclusion the district court stated that “the DOC [could] reasonably assure the safety of Kosilek and others after sex reassignment surgery by housing Kosilek in a segregated protective custody unit.” Kosilek, 889 F.Supp.2d at 243. Yet, the court also warned that “it may foreseeably be argued that keeping Kosilek in segregation is unnecessary and a form of extrajudicial punishment that is prohibited by the Eighth Amendment.” Id. at 245. The tension between these statements is clear, and the district court’s proffer that we disregard security concerns based on the existence of a possibility for segregated housing appears unreasonable when, in short turn, they assert that such a course of action would violate the Constitution.
The majority defends the district court’s determination in part by noting that Kosi-lek may continue to be housed in MCI-Norfolk’s general population where no security issues have arisen during her tenure. The fact that no such issues have arisen in the past, however, does not necessarily render inappropriate or unreasonable the DOC’s concerns that issues might *783 present themselves in Kosilek’s post-operative future. Certainly, courts cannot and should not strip from prison officials the ability to consider and implement prophylactic solutions to foreseeable issues reasonably within the scope of their security expertise. In fact, such a retroactive style of administration would, in itself, seem to amount to just the sort of indifference to credible threats of harm that might constitute a constitutional violation. See Cortes-Quiñones v. Jiménez-Nettleship, 842 F.2d 556, 558 (1st Cir.1988) (stating that prison officials have a duty to take reasonable measures to protect prisoners from harm).
Ultimately, in a feat of conclusory reasoning, the district court overlooked the legitimacy of the DOC’s concern based on its belief that the decision to deny SRS was a response to “public and political criticism.”[43] Kosilek, 889 F.Supp.2d at 240. The evidence on record tending to support this theory includes a press appearance by Commissioner Dennehy, negative news coverage regarding Kosilek’s request for surgery, and letters received by the DOC from members of the Massachusetts legislature. Surely, this evidence provides ample support for the fact that public criticism existed and was leveled at the DOC, both by the media and politicians. It in no way, however, proves the DOC’s reasons for denying Kosilek’s request or shows that this denial was motivated specifically by the public outcry.
In any case, even if the district court’s finding that public criticism played a role in shaping the DOC’s decision is accepted wholesale,[44] this finding might at most counsel for the DOC to lose “the advantage of deference.” Battista, 645 F.3d at 455 (emphasis added). It cannot, however, suddenly render superfluous the very real concerns the DOC expressed about housing Kosilek after her operation. I find no license in the record for the district court to have wholly dismissed the validity of these concerns.
V. Kosilek’s Eighth Amendment Claim
Having set forth my disagreements with the district court’s conclusions regarding the scope of medical prudence, the potential for adequate treatment short of surgery, and the DOC’s security concerns, I turn to the task of determining whether Kosilek has proven deliberate indifference to a serious medical need. Cameron, 990 F.2d at 20 (“Indeed, when it comes to constitutional rights, none of the professionals has the last word. Professional judgment, as the Supreme Court has explained, creates only a ‘presumption’ of correctness; welcome or not, the final responsibility belongs to the courts.”) (citing Youngberg v. Romeo, 457 U.S. 307, 323, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)). As a starting point, this review must embrace the many competing concerns, including those relevant to prison administration, that are inherent in our constitutional inquiry, for there is “[n]othing in the Constitution [that] mechanically gives controlling *784 weight to one set of professional judgments.” Id.
What is clear is that the DOC has, for several years, provided Kosilek with significant treatment for her GID. Equally clear is that this treatment has resulted in marked improvement in Kosilek’s mental state and contentment. She is not currently suicidal, and all reported instances of self-harm occurred two decades ago, long prior to her current course of treatment. The DOC also stands prepared to offer additional psychiatric services should Kosilek begin exhibiting signs of suieidality. I can see no violation on these facts. Not performing surgery is not the most compassionate solution to Kosilek’s GID. Neither, however, does it fall outside the scope of clear professional standards, De-Cologero, 821 F.2d at 43, or illustrate severe obstinacy and disregard of Kosilek’s medical needs, DesRosiers, 949 F.2d at 19 (“[T]he complainant must prove that the defendants had a culpable state of mind and intended wantonly to inflict pain.” (citations omitted)).
Kosilek is receiving, and would continue to receive, a regimen of treatment that mitigates the severity of her GID. This treatment is far from the proverbial “aspirin” doled out to a cancer patient in lieu of chemotherapy. See ante at 765. Rather, the DOC has for years ensured an individualized treatment plan for her physical and mental needs as well as consistent access to a team of specialists. I do not see in this treatment, nor does the district court or majority make clear, any “reasonable basis,” see ante at 763, for a finding of wanton disregard. Giroux, 178 F.3d at 32 (requiring a level of “excessive risk” like that of criminal recklessness); DesRosiers, 949 F.2d at 19. Rather, giving due consideration to countervailing security concerns and based on a review of the record that shows the DOC’s proposed care was not outside the realm of professionalism, I cannot say that the DOC has failed to adequately care for Kosilek’s GID or callously ignored her pain. Feeney v. Corr. Med. Servs., Inc., 464 F.3d 158, 162 (1st Cir.2006) (“The care provided must have been ‘so inadequate as to shock the conscience.’ ” (quoting Torraco, 923 F.2d at 235)).
Facing litigation that was equally protracted and passionate, the district court’s task was by no means a simple one. The complexities of this case were many, and the testimony considerable. I am convinced, however, that the district court ultimately erred in several key respects, skewing its factual conclusions towards a result, now upheld by the majority, that is beyond the boundaries of our accepted legal precedent.
The Eighth Amendment proscribes punishment, including punishment in the form of medical care so unconscionable as to fall below society’s minimum standards of decency. See Wilson v. Seiter, 501 U.S. 294, 300, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); Estelle, 429 U.S. at 102, 97 S.Ct. 285. Its boundary simply does not reach, however, to instances of care that, although not ideal, illustrate neither an intent to harm nor the obstinate and unwarranted application of clearly imprudent care. Respectfully, I would reverse.

. The district court adopted masculine pronouns in reference to Kosilek’s anatomical gender. See Kosilek v. Spencer, 889 F.Supp.2d 190 (D.Mass.2012). Kosilek, however, self-identifies as female and has undertaken significant efforts, including through treatment provided by the DOC, to formalize this gender presentation. I therefore follow the majority's practice of using female pronouns.

. Kosilek has previously attempted suicide and self-castration while in custody. These attempts were made prior to 1992, while Ko-silek was awaiting trial on murder charges.

. While "no broader review is authorized ... simply because this is a constitutional case,” see Maine v. Taylor, 477 U.S. 131, 145, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986), I believe that where such rights are implicated in cases presenting closely intertwined questions of law and fact our court would be wise to tread carefully before applying, in toto, a clearly erroneous standard of review. Although the Supreme Court has rejected the application of a higher standard of review in constitutional cases where the question at hand was one purely of "historical fact,” the Court has not expressly foreclosed heightened review to other questions involving "legal, as well as factual, elements.” Hernandez v. New York, 500 U.S. 352, 366-67, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). The majority makes much of the fact that I have previously explained the existence of a circuit split — in which the First Circuit has not taken a side— regarding whether heightened review of underlying facts would appropriately apply in cases in which a .right is protected below. United States v. Frabizio, 459 F.3d 80, 96 (1st Cir.2006) (Torruella, J., concurring). Critically, however, I do not now sound a call for plenary review of what are wholly factual findings. Cf. Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 499, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). Rather, I intend a more general point, cautioning that where factual determinations and constitutional standards are closely related we ought to carefully ensure that such subordinate determinations do not erroneously cast the die of our legal conclusions. After all, our ultimate conclusions derive unquestionably from legally operative standards, and it is undoubtedly the duty of appellate courts to "to clarify]]] [such] legal principles.” Ornelas v. United States, 517 U.S. 690, 697, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

. The majority is correct to note that the Ninth Circuit has found the question of adequate medical alternatives to be one of fact. Snow v. McDaniel, 681 F.3d 978, 988 (9th Cir.2012). Yet, Ninth Circuit practice includes plenary review of a district court's eventual Eighth Amendment holding. Thus, I seriously question the majority’s proclamation that our sister circuit "takes a similar approach” to the one they now advocate.

. The majority notes that our court has previously upheld a finding of deliberate indifference where the district court had a “reasonable basis” for its finding. Battista, 645 F.3d at 455. That same opinion, however, made clear that a finding of deliberate indifference was appropriately "reviewed on appeal more closely than [] district court fact-finding.” Id. at 454 (citations omitted). While the majority admits of this subtlety, see ante at 762, its review then appears to abdicate such nuance and apply maximum deference throughout. In any case, where, as here, the district court’s determinations were infected by various errors as described below, I believe the majority presumes too much regarding their reasonableness.

. That GID is a serious medical condition is not contested. Further, the fifth question need only be reached upon establishing a constitutional violation, for the purposes of crafting a remedy. Therefore, I focus on only the second, third, and fourth questions presented.

. In my reading, Dr. Schmidt never counseled for denying surgery. His testimony suggested deference to a patient's choice and willingness to release medical records to qualified surgeons. He then expressed concern as to whether a prisoner could ever meet readiness criteria for surgery, noting disagreement with the district court’s presumption that a real-life experience could necessarily occur behind bars. Although admonishing Dr. Schmidt for purportedly ignoring the Standards of Care, the district court discredited his testimony in part based on this expression of concern regarding whether a real-life experience — a key component of those Standards' — could occur in prison. See Kosilek, 889 F.Supp.2d at 235. In fact, in combination with the district court’s insistence that Dr. Levine ignore questions regarding this real-life experience and instead presume that the experience necessarily can and did occur, this suggests a purposeful tipping of the testimonial scales away from an area of potentially worthy inquiry.

. This admittedly unenthusiastic endorsement referenced Dr. Schmidt’s proposed treatment presuming that there was a total absence of countervailing factors to consider in developing a treatment plan.

. It is rare, to my understanding, that medical treatments may so neatly and completely delineate between symptom and disease. Certainly, were a patient to present with signs of both obesity and severe hypertension, it is an uncommon doctor that would disparage a peer for prescribing blood-pressure medication, although designed no doubt to treat a symptom.

. The Massachusetts DOC has recently undertaken a significant effort to ensure it is well-prepared to address the needs of prisoners exhibiting symptoms of suicidality. See Disability Law Ctr. v. Mass. Dep't of Corr., C.A. No. 07-10463-MLW, 960 F.Supp.2d 271, 2012 WL 1237760 (D.Mass. Apr. 12, 2012). I see nothing to suggest such care, if provided, would not itself be thorough and adequate. Moreover, it bears consideration that Kosilek is not currently suicidal and that although her medical providers suggest a likelihood that suicide ideation will reemerge if SRS is not provided, there is no indication as to the severity, duration, or even sole causal factors of this potential result. As Dr. Levine testified, the presumption that Kosilek may become suicidal must also recognize the potential that this impulse is not stagnant, but might naturally — and with the assistance of therapy — dissipate or "evolve over time.”

. I find the DOC’s concerns regarding Kosi-lek’s post-operative housing significant. I do not, however, dispute the district court's finding, affirmed by the majority, that any security concerns regarding Kosilek's ability to escape custody while being transported for surgery are, at best, extremely minimal. Prison officials have significant experience transporting prisoners, and both Kosilek’s age and history of good behavior counsel in favor of safe transport.

. Perhaps cognizant of the inferential leap made by the district court, see ante at 771, the majority places greater emphasis on other rationales mentioned by the district court. The district court's opinion, however, makes clear that its conclusion rested predominantly on concern about public opinion. Kosilek, 889 F.Supp.2d at 240 ("[T]he defendant has refused to provide ... [SRS] in order to avoid public and political criticism. This not a legitimate penological purpose. Therefore, the defendant’s conduct ... violates the Eighth Amendment.”).

. As the majority notes, credibility determinations of this type are given particular deference by our court. See ante at 771-72. Thus, while I see no extrinsic support in the record, I recognize I cannot equal the district court's ability to hear and weigh testimony.