THOMPSON, Circuit Judge,
dissenting.
The majority turns a blind eye to binding precedent, opting instead to cobble together law from other circuits and non-Eighth Amendment jurisprudence to formulate a standard of review that, though articulated as one of variable exactitude, amounts to sweeping de novo review. Armed with the ability to take a fresh look at findings that clearly warranted deference, the majority easily steps into the trial judge’s shoes — the inarguable superi *97 ority of the judge’s ability to marshal facts, assess motive, and gauge credibility all but forgotten. The parameters set by the majority foretold the result. It concludes that the Massachusetts Department of Correction did not-violate Michelle Kosi-lek’s constitutional rights. That conclusion is erroneous, the majority’s analytical path to it is misguided, and the fact that this case is even subject to en banc scrutiny in the first place is wrong. And so I dissent.
I. En Banc Grant
The criteria for en banc relief are clear: it is not a favored form of relief, and ordinarily should not be ordered unless “(1) en banc consideration is necessary to secure or maintain uniformity of the court’s decisions; or (2) the proceeding involves a question of exceptional importance.” Fed. R.App. P. 35(a). My colleagues’ reasons for granting en banc review are not articulated, but it seems clear that the maintenance of uniformity piece is not in play. Therefore I can only assume they perceive an issue of exceptional importance. This justification is problematic.
As my colleague has explained in a series of thoughtful dissents, in this circuit there has been what some might see “as the recurring unprincipled denial and granting of petitions for rehearing en banc, without any attempt to define and apply a set of objective criteria to determine when a case is of exceptional importance.” Kolbe v. BAC Home Loans Servicing, LP, 738 F.3d 432, 474 (1st Cir.2013) (Torruella, J., dissenting); see also Igartúa v. United States, 654 F.3d 99, 105 (1st Cir.2011) (Torruella, J., filing opinion concerning denial of en banc consideration); United States v. Vega-Santiago, 519 F.3d 1, 7 (1st Cir.2008) (Torruella, J., dissenting). I am at a loss to see what objective criteria warranted review in this case.
While the relief ordered by the district court, and affirmed by a majority of the original panel, was unprecedented, Kosi-lek’s case is not a legally complicated one. Rather it is a fact-intensive dispute, which required the original panel to determine whether the district court’s take on the significant amount of evidence, and its ultimate holding as to the existence of an Eighth Amendment violation, was erroneous. I fail to see what in this framework made this case worthy of en banc review.
I am not implying this case is unimportant. This litigation is significant to Kosi-lek, the DOC, and many others, and the rights afforded under the Eighth Amendment are crucial. But if those things alone were enough, nearly every case would attract the full court’s attention. And a good deal more cases would be heard en banc if disagreeing with the result reached by the original panel, or simply desiring to weigh in, were valid grounds for awarding en banc review. They are not, but unfortunately I suspect they were the grounds that carried the day here. See, e.g., Kolbe, 738 F.3d at 474 (Torruella, J., dissenting) (“En banc consideration is not for the purpose of correcting panel decisions.”) (citing Calderón v. Thompson, 523 U.S. 538, 569, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998) (Souter, J., dissenting)).
This case does not satisfy the well-settled requirements for a grant of en banc. Lamentably, a majority of this court decided otherwise. Similarly, a majority has decided that the district court got it wrong. That conclusion is fundamentally flawed, starting with the level of scrutiny paid to the lower court’s decision.
II. Standard of Review
The issue of what standard of review should be employed is a significant point of divergence for me, and indeed one that permeates the entirety of my discord with *98 the majority. The majority, undoubtedly aware that it could more handily toss aside the district court’s findings if it utilized a non-deferential standard of review, formulates its standard by borrowing liberally from other circuits and non-Eighth Amendment jurisprudence while disregarding on-point case law from this circuit. The end result is a standard that, in theory, afforded minimal deference to the lower court’s finding, and in the majority’s actual application, afforded essentially none.
Let me start with our common ground. I agree with the majority that different standards of review are in play. When deciding a post-bench-trial appeal, this court takes up questions of law de novo, but reviews findings of fact for clear error only. Wojciechowicz v. United States, 582 F.3d 57, 66 (1st Cir.2009). On the latter point, this means we accept the court’s factual findings, and the inferences drawn from those facts, unless the evidence compels us to conclude a mistake was made. Janeiro v. Urological Surgery Prof'l Ass’n, 457 F.3d 130, 138 (1st Cir.2006). With inquiries that are more of a mixed bag, there is a continuum. Johnson v. Watts Regulator Co., 63 F.3d 1129, 1132 (1st Cir.1995). The more fact-intensive the question, the more deferential our review. Id. Conversely, the more law-dominated the query, the more likely our review is de novo. Id.
That is where the congruity ends. The majority, undoubtedly with a certain end result in mind, maneuvers the standard of review into its most favorable form. While it correctly-acknowledges that factual and legal issues are implicated, the majority utterly favors the de novo end of the spectrum.[20] This approach does not accord with our case law (although to read the majority you would think we had very little on-point jurisprudence in this circuit).
For one, the majority posits that the issue of deliberate indifference is a legal one to be reviewed de novo. It relies on Fourth Amendment jurisprudence, citing criminal cases that, in the context of deciding the validity of searches and seizures, hold that reasonable suspicion and probable cause determinations should receive de novo appellate review. See Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); United States v. Camacho, 661 F.3d 718, 724 (1st Cir.2011). I do not see how these cases are analogous to Kosilek’s challenge, nor why we should look to Fourth Amendment cases rather than our Eighth Amendment jurisprudence.
In the context of the Eighth Amendment, we have explained that the existence of deliberate indifference is a “state-of-mind issue” that usually presents a jury question, Torraco v. Maloney, 923 F.2d 231, 234 (1st Cir.1991), or in other words, an issue for the finder of fact. This makes sense. Often intertwined in state-of-mind issues are determinations about credibility and motivation; those are classic examples of the judgment calls to which we give deference. See Fed.R.Civ.P. 52(a)(6) (“[T]he reviewing court must give due re *99 gard to the trial court’s opportunity to judge the witnesses’ credibility.”); Monahan v. Romney, 625 F.3d 42, 46 (1st Cir.2010). See also Janeiro, 457 F.3d at 138-39 (explaining that, following a bench trial, “if the trial court’s reading of the record [with respect to an actor’s motivation] is plausible, appellate review is at an end”) (alteration in original).
The majority recognizes Torraco, citing it for the narrow proposition that “issues of culpability in a deliberate indifference inquiry are usually questions for a jury,” in connection with its discussion about what standard of review findings of fact garner. But this is a mischaracterization of what Torraco held. Rather, the case states that “the existence of deliberate indifference,” is a state-of-mind issue, which makes it a typical juror question. Torraco, 923 F.2d at 234 (emphasis added). The majority’s slight spin on this holding allows it to ignore Torraco, and lean on Fourth Amendment jurisprudence instead to support the notion that deliberate indifference gets a fresh look from this court.
Similarly erroneous is the majority’s position that we review de novo the district court’s ultimate determination as to whether an Eighth Amendment violation occurred. For support it cites to a series of Eighth Amendment cases from other circuit courts. See, e.g., Thomas v. Bryant, 614 F.3d 1288, 1307 (11th Cir.2010); Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir.2002). At first blush, there is some surface appeal to this position. If nothing else, the existence of a constitutional violation sounds like something that would fall closer to the question-of-law end of the spectrum. The problem though is that the ultimate constitutional question is inextricably tied up with the factual details that emerged at trial, the credibility of the witnesses, and the questions of motivation. This counsels against pure de novo review and our own case law supports this notion.
As explained above, a state-of-mind issue such as the existence of deliberate indifference is typically left to the finder of fact. Torraco, 923 F.2d at 234. And when reviewing a trial judge’s determination on the adequacy of medical treatment following a bench trial, this court has applied the deferential clearly erroneous standard. DesRosiers v. Moran, 949 F.2d 15, 19-20 (1st Cir.1991). On top of this, it is well established that “elusive issues of motive and intent” (relevant here in connection with the Eighth Amendment’s subjective prong) are typically fact-bound ones subject to the clearly erroneous rule. Fed. Refinance Co. v. Klock, 352 F.3d 16, 27-28 (1st Cir.2003); see also McIntyre ex rel. Estate of McIntyre v. United States, 545 F.3d 27, 40 (1st Cir.2008). Thus the major pieces of the puzzle in an Eighth Amendment inquiry — adequacy of medical care, the existence of deliberate indifference, and the parties’ motive and intent — are subject to the clearly erroneous standard, making unqualified de novo review a bad fit.
Policy concerns do not counsel otherwise, making the majority’s reliance on Ornelas, 517 U.S. at 690, 116 S.Ct. 1657, a Fourth Amendment case, not particularly persuasive.[21] Ornelas, which character *100 ized the ultimate reasonable suspicion and probable cause determination as a mixed question of law and fact, decided that de novo review was the best fit for its resolution. Id. at 696-97, 116 S.Ct. 1657. The Supreme Court, as the majority points out, emphasized that “[independent review” by appellate courts can help “to maintain control of, and to clarify, the legal principles” in reasonable suspicion and probable cause cases. Id. at 697, 116 S.Ct. 1657. While I do not disagree that as an appellate court we are often required to clarify legal principles and ensure continuity of the law’s development, this is not a persuasive justification for employing de novo review here.
As noted by the dissent in Ornelas, “[l]aw clarification requires generalization, and some issues lend themselves to generalization much more than others.” Id. at 703, 116 S.Ct. 1657 (Scalia, J., dissenting). The issues here do not. Cases dealing with the constitutional adequacy of medical care under the Eighth Amendment are incredibly fact-specific, resulting in distinctive issues. The trial judge must, among other things, have a handle on the prisoner’s medical condition, the treatment sought, the treatment provided (if any), what treatment medical providers recommended, what the defendant knew and when, and what motivated its decisions. This court cannot hope to match the district judge’s expertise in these areas, nor can I fathom why we would want to try. The “extremely fact-bound nature” of these cases means that “de novo review [will] have relatively little benefit,” id. at 700, 116 S.Ct. 1657 (Scalia, J., dissenting), leaving us unmoved by the uniformity-of-the-law considerations raised by the majority.
So where does all this leave us with regard to the standard that attaches to the determination of whether the Eighth Amendment has been violated? It is clear (and the majority agrees) that with questions of varying exactitude, the “standard of review applied depends, in the last analysis, on the extent to which a particular question is fact-dominated or law-dominated.” Turner v. United States, 699 F.3d 578, 584 (1st Cir.2012) (internal quotation marks omitted); see also In re IDO Clambakes, Inc., 727 F.3d 58, 64 (1st Cir.2013); Dugas v. Coplan, 506 F.3d 1, 8 (1st Cir.2007). Drawing the distinction between law-heavy versus fact-heavy questions is sometimes a tricky thing to do, and given that establishing an Eighth Amendment claim involves a mixed question of law and fact, it is a thicket into which we must enter. Luckily, I do not think it is a particularly thorny one in this case.
Here, before reaching its ultimate constitutional conclusion, the trial court heard testimony from no fewer than nineteen witnesses (e.g., medical providers, medical experts, prison officials, and Kosilek) over the course of a trial that ultimately extended two years. The court scrutinized events that had transpired over a twenty-year period, including those relating to what treatment Kosilek had requested, what treatment had been recommended, and what care was ultimately provided. The court considered evidence about the DOC’s security review, how it was conducted, and the concerns it raised. It assessed the credibility of Kosilek, DOC officials, and the medical experts. The court reviewed a copious amount of exhibits, such as Kosilek’s medical records, Ko-silek’s prison records, DOC policies, DOC contracts, DOC manuals, reports from Ko-silek’s medical providers, reports penned by each side’s experts, DOC staff meeting notes, security reports, medical literature, *101 correspondence, and deposition testimony. The end result was pages upon pages of factual findings made by the trial judge.[22]
In other words, the district court “engaged in a careful and close analysis of the trial evidence,” Turner, 699 F.3d at 584, to make its ultimate determination that the DOC, without any valid penological purpose,'refused to provide medically necessary treatment for Kosilek’s life-threatening condition. Given the clearly fact-intensive nature of the court’s review, our own examination into whether the court was correct that the DOC violated the Eighth Amendment should be deferential, as opposed to the fresh look the majority proposes.[23] See id.; Fed. Refinance Co., 352 F.3d at 27 (explaining that the more fact-intensive the question, the more deferential our review). As ably said by the Supreme Court, “deferential review of mixed questions of law and fact is warranted when it appears that the district court is better positioned than the appellate court to decide the issue in question, or that probing appellate scrutiny will not contribute to the clarity of legal doctrine.” Salve Regina Coll. v. Russell, 499 U.S. 225, 233, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991) (internal quotation marks omitted).
The majority’s articulation of a standard of review that runs afoul of our case law is not the only problem. There is also its application. While the majority’s skewed standard allows minimal aspects of the lower court’s decision to garner clear error review, namely factual findings and credibility determinations, in actual application essentially no deference was paid. The only conclusion of the district court that the majority concedes warranted deference was the judge’s determination that Commissioner Kathleen Dennehy’s testimony was not credible.[24] Given the voluminous record in this case, and the breadth of the lower court’s findings, it is simply unfathomable that the majority did not consider a single other fact-drawn inference, credibility finding, or motive determination, all of which warrant deference.
For instance, the district court drew inferences from the various medical providers’ testimony to decide what constituted a prudent approach. It also considered what Commissioner Harold Clarke’s motivations were for denying sex reassignment surgery. It drew inferences from the DOC’s conduct (e.g., the timing of security reviews and the DOC’s communications with Kosilek’s medical providers) to determine that the DOC had engaged in prevarication and delay. The majority; however, does not appear to adjust its consideration of these issues to reflect any deference to the trial judge. Rather it decides anew what inferences should be drawn from the facts attested to at trial. Even under the majority’s standard, this is not proper.
*102 Without doubt, the level of scrutiny applied by a court permeates its analysis and guides the outcome. The impact here is clear. The Eighth Amendment is violated when prison officials fail to provide an inmate with adequate medical care, such that “their ‘acts or omissions [are] sufficiently harmful to evidence deliberate indifference to serious medical needs.’ ” Leavitt v. Corr. Med. Servs., Inc., 645 F.3d 484, 497 (1st Cir.2011) (citing Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). The district court concluded that the evidence established the DOC had committed such a violation. The majority says otherwise but its analysis is plagued with flaws, starting with its determination as to the objective prong.
III. Eighth Amendment: Objective Prong
Whether the so-called objective component of the Eighth Amendment inquiry is satisfied turns on whether the alleged deprivation is “objectively, sufficiently serious.” Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (internal quotation marks omitted); Leav-itt, 645 F.3d at 497. In this context, a prisoner with a “serious medical need,” Mahan v. Plymouth Cnty. House of Corr., 64 F.3d 14, 17-18 (1st Cir.1995), is entitled to adequate medical care, i.e., “services at a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards.” United States v. DeCologero, 821 F.2d 39; 43 (1st Cir.1987).
That gender identity disorder is a serious medical need which warrants treatment, is not, as the majority notes, disputed. The disagreement — both between the parties and amongst this en banc court— centers around whether the district court correctly found that the DOC’s proffered regimen of care was inadequate, and that sex reassignment surgery is the only appropriate treatment for Kosilek. Based on the record, and when one employs the proper standard of review, that conclusion was generously supported by the evidence.
A. Dr. Schmidt’s Prudence
To start, despite the majority’s qualms, the district court’s conclusion that the DOC’s expert, Dr. Chester Schmidt, was not a prudent professional was not clearly erroneous. In his testimony, Dr. Schmidt expressed a good deal of disagreement with the Harry Benjamin Standards of Care, which were widely relied upon by the other medical providers who testified below and which have been generally accepted by courts. See, e.g., De’lonta v. Johnson, 708 F.3d 520, 522-23 (4th Cir.2013) (describing the Standards of Care as “the generally accepted protocols for the treatment of GID”); Soneeya v. Spencer, 851 F.Supp.2d 228, 231 (D.Mass.2012) (noting that the “course of treatment for Gender Identity Disorder generally followed in the community is governed by the ‘Standards of Care’ ”); O’Donnabhain v. Comm’r of Internal Revenue, 134 T.C. 34, 65 (U.S.Tax Ct.2010) (indicating that the Standards are “widely accepted in the psychiatric profession, as evidenced by the recognition of the standards’ triadic therapy sequence as the appropriate treatment for GID and transsexualism in numerous psychiatric and medical reference texts”).
While, as the majority notes, the Standards of Care have a built-in flexibility, that pliancy appears to stem from the uniqueness of patient needs and the evolution of the gender identity disorder field.[25] *103 Dr. Schmidt’s departure from the Standards appeared more fundamental. For instance, the Standards of Care explained that sex reassignment surgery is not “experimental, investigational, elective, cosmetic, or optional in any meaningful sense.” Standards of Care, Version 6, at 18. Dr. Schmidt disagreed. In his expert report, he wrote that sex reassignment surgery was a “voluntary, elective choice[ ] and procedure[ ],” calling the steps towards reassignment “equivalent to a variety of elective cosmetic non-surgical procedures and elective cosmetic surgical procedures.” Another example: the Standards of Care provide that, for persons with severe gender identity disorder, sex reassignment surgery is effective, and when paired with hormone therapy and a real-life experience, “medically indicated and medically necessary.” Standards of Care, Version 6, at 18. Dr. Schmidt again was not on board. He testified that generally he does not believe that sex reassignment surgery is medically necessary and his practice manifests this philosophy. In the approximately 300 patients he had evaluated, Dr. Schmidt never recalled seeing even one case of gender identity disorder serious enough to warrant surgery.[26]
For Dr. Schmidt, there was an additional wrinkle. In Dr. Schmidt’s opinion, a real-life experience living as the opposite gender could not be effectively replicated in prison, and this counseled against surgery for Kosilek. The district court found that this viewpoint was not prudent. The majority claims that in doing so the court “relied on its own — non-medical—judgment about what constitutes a real-life experience.” This is not accurate.
The court based its determination, back in Kosilek I, on the testimony of Dr. Marshall Forstein and Dr. George Brown, who “convincingly testified [that] Kosilek’s ‘real life’ is prison.” Kosilek v. Maloney, 221 F.Supp.2d 156, 167 (D.Mass.2002). Then in Kosilek II, the court found the “credible evidence in the instant case confirmed the conclusion in Kosilek I that a person can have a ‘real life experience’ in prison.” Kosilek v. Spencer, 889 F.Supp.2d 190, 232 (D.Mass.2012). Evidence before the court in Kosilek II included an expert report from Dr. Forstein, and testimony from Dr. Randi Kaufman, both of whom indicated that Kosilek had undergone a real-life experience in prison. There was also the February 24, 2005 report from the Fenway doctors, Dr. Kevin Kapila and Dr. Kaufman, which explained that Kosilek had moved successfully through the steps outlined by the Standards of Care. Then, in their October 7, 2005 report, the Fenway doctors explained at length why Cynthia Osborne’s review subtly distorted the concept of the real-life experience, and why Kosilek had completed the real-life test-a test made even more stringent by the fact that she was living as a female in an all-male prison. Dr. Brown echoed a similar sentiment. He testified that Kosilek had not only met the minimum real-life experience but had exceeded it. Dr. Brown focused on the significant amount of infor *104 mation that existed regarding Kosilek’s time in prison, a record that his patients in the outside world would never have.[27]
The record is clear. The district court’s determination that Dr. Schmidt’s viewpoint about the feasibility of a real-life experience in prison was not based on the judge’s own lay opinion. It was, as the district court alluded to, grounded in a significant amount of evidence offered by competent medical professionals, all of whom disagreed with Dr. Schmidt.[28]
The same can be said about what course of treatment was appropriate for Kosilek. Dr. Schmidt testified that Kosilek had “made an excellent adaptation” on her current treatment regimen and that surgery would not “confer any additional functional capability.” Surgery was not, according to Dr. Schmidt, medically necessary for Kosi-lek. To minimize the risk of future harm to Kosilek, Dr. Schmidt thought employing psychotherapy and medication to reduce her dysphoria and, if needed, placing Kosi-lek in a medical facility would be effective. A majority of the testifying medical providers said, otherwise though. When asked what they thought about Dr. Schmidt’s suggested regimen, Drs. Kapila, Kaufman, Appelbaum, and Forstein all thought it unreasonable.[29] The common thinking was that Dr. Schmidt’s approach was not likely to effectively reduce Kosi-lek’s risk of self harm, given that the source of her dysphoria was her male genitalia.
In the Eighth Amendment context, the adequacy of medical care is “measured against ‘prudent professional standards.’ ” Nunes v. Mass. Dept. of Corr., 766 F.3d 136, 142 (1st Cir.2014) (quoting DeCologero, 821 F.2d at 43). The district court here concluded that Dr. Schmidt was not a prudent professional. Given the above, I am not convinced that this determination was clearly erroneous. Dr. Schmidt’s significant disagreement with widely accepted guidelines and the sharp contrast between his and the other well-credentialed providers’ opinions, offer strong support for the court’s finding.
B. Adequacy of the DOC’s Treatment
In light of the court’s determination as to Dr. Schmidt’s prudence, the question remains whether the evidence supported its conclusion that the DOC’s treatment was not medically adequate. The majori *105 ty’s consideration of this issue begins with a faulty premise. It states that the “district court held that psychotherapy and antidepressants alone would not adequately treat Koslilek’s GID,” a finding the majority calls an incorrect characterization of the issues, and a minimization of the DOC’s proffered treatment plan. It is the majority who is wrong.
The district court was of course well aware that the DOC was suggesting a more comprehensive treatment plan beyond therapy and medication. Nonetheless, as it repeatedly explained, it found that all treatment other than sex reassignment surgery was inadequate for Kosilek. See, e.g., Kosilek, 889 F.Supp.2d at 202, 283, 236, 238, 240. This included the DOC’s past treatment, as well as its intended treatment going forward. In other words, the court did not minimize the DOC’s regimen. Based on the testimony and evidence presented, it simply found the regimen did not, and would not going forward, adequately treat Kosilek’s gender identity disorder. This finding was well within the court’s purview to make. The 'fact that the DOC fashioned some treatment, in the form of hormone therapy, electrolysis, and access to feminine items does not insulate it from liability. In De’lonta v. Johnson, the Fourth Circuit Court of Appeals found that an inmate, who sought sex reassignment surgery after her gender identity disorder failed to resolve despite receiving hormones, stated a plausible deliberate indifference claim. 708 F.3d at 522, 525. The court concluded that, though the Virginia Department of Corrections had provided the inmate with hormone therapy’ and psychological counseling consistent with the Standards of Care, “it does not follow that they have neeessarily provided her with constitutionally adequate treatment.” Id. at 522, 526 (emphasis in original).
The majority nonetheless would have us believe the care provided by the DOC can withstand constitutional scrutiny. It endeavors to convince by giving little weight to the attested to shortcomings in Kosi-lek’s treatment plan, and instead focusing heavily on the improvement Kosilek has made since being provided hormones, electrolysis, feminine garb and gear, and mental health treatment. This is not in dispute; Kosilek has indeed progressed. However, despite the short shrift the majority pays it, there was ample evidence supporting the district court’s conclusion that this improvement was not sufficient to ease Kosilek’s suffering to a point where she was no longer facing a life-threatening risk of harm.
Though the DOC has been treating Ko-silek for many years, the district court found that she “continues to suffer intense mental anguish.” Kosilek, 889 F.Supp.2d at 202. The court chronicled the evidence: Kosilek’s own testimony about her continued distress,[30] the Fenway Center report indicating Kosilek’s ongoing angst over her male genitalia and the high likelihood of another suicide attempt, and the along-the-same-lines testimony of Kosilek’s treating psychologist, Mark Burrowes. See id. at 226. There was also Dr. Kaufman’s testimony that, even with the treatment the DOC provided, Kosilek still suffered from clinically significant distress and severe dysphoria, a fact she found “quite notable.” Dr. Brown testified similarly, explaining that Kosilek’s treatment to date, including the hormones, had not obviated her need *106 for surgery. Further, there was evidence that Kosilek’s improvement was tangled up in her continuing hope that sex reassignment surgery would be provided. Dr. Brown testified: “And without that hope, the [DOC’s] treatments are — I wouldn’t say for naught, but they are not going to continue her level of improvement where she is now.”
Thus, even with Kosilek’s documented improvement, Drs. Brown, Kaufman, For-stein, Kapila, and Appelbaum all testified unequivocally that sex reassignment surgery was medically necessary and the only appropriate treatment for Kosilek. They further agreed that there was a serious risk of harm, most likely suicide, should Kosilek not receive the surgery, which was a concern the Fenway doctors voiced as early as 2005. As the majority says, this potentiality matters because the Eighth Amendment’s protections extend beyond present suffering to future harm. See Helling v. McKinney, 509 U.S. 25, 33-34, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993); Leavitt, 645 F.3d at 501.
The DOC’s assertion that this future risk could be curbed with medication and psychotherapy cannot carry the day. As the district court found, treating the underlying disorder and its symptoms are two very different things, a distinction also drawn by the Seventh Circuit. See Fields v. Smith, 653 F.3d 550 (7th Cir.2011). In Fields, the court found a Wisconsin statute that prohibited the state’s correctional department from providing transgender inmates with hormones and sex reassignment surgery unconstitutional. Id. at 552-53, 559. The court, discussing how some patients require hormone therapy, found the department of corrections had not effectively rebutted the evidence that an offering of medication and psychotherapy would “do nothing to treat the underlying disorder.” Id. at 556. In the instant matter, Drs. Appelbaum and Kapila testified that the preferred approach is to treat the underlying problem — Kosilek’s gender identity disorder — as opposed to the symptoms it might produce. As chronicled above, the consensus was that the only way to adequately treat that problem was with sex reassignment surgery.
Lest we forget, the procedural posture of this case bears another mention. The DOC is challenging the district court’s grant of injunctive relief following a bench trial, meaning that due regard is paid to the judge’s factual findings and credibility determinations. See Monahan, 625 F.3d at 46. When the evidence yields competing inferences or two permissible views, we cannot second guess, “even if, had we been sitting as triers of the facts, we might have arrived at a different set of judgments.” N. Ins. Co. of N.Y. v. Point Judith Mama, LLC, 579 F.3d 61, 67 (1st Cir.2009). Here the judge concluded that the DOC’s present treatment regimen, with the added medication and therapy to cushion the post-surgery-denial fallout, would not reduce Kosilek’s suffering to the point where she did not have a major medical need. Rather, sex reassignment surgery was the only adequate treatment for Kosilek’s life-threatening disorder. As detailed above, these findings were supported by the un-objected to testimony of multiple eminently qualified doctors, by widely accepted, published standards, and by the testimony of Kosilek herself. The factfinder found this evidence convincing; he found the DOC’s evidentiary offering less so. It is not for us to re-weigh the evidence and second-guess this determination, but that is exactly what the majority does.
What’s more, by upholding the adequacy of the DOC’s course of treatment, the majority in essence creates a de facto ban on sex reassignment surgery for inmates in *107 this circuit. Its attempt to repudiate this notion is not compelling. For instance, the fact that the DOC has “disclaimed any attempt to create a blanket policy regarding SRS” is a non-starter. The issue is not whether correctional departments will voluntarily provide the surgery, it is whether the precedent set by this court today will preclude inmates from ever being able to mount a successful Eighth Amendment claim for sex reassignment surgery in the courts. Equally unconvincing is the majority’s assertion that the “unique circumstances” presented by Kosi-lek’s case will prevent any de facto ban. The first so-called anomaly cited by the majority — the divergence of opinion as to Kosilek’s need for surgery — only resulted from the DOC disregarding the advice of Kosilek’s treating doctors and bringing in a predictable opponent to sex reassignment surgery. It is no stretch to imagine another department of corrections stealing a page from this play book, i.e., just bring in someone akin to Osborne. It is hardly a matchless scenario. The same goes for Kosilek’s criminal history and post-surgical housing options, which the majority also points to. Rare will be the prisoner who does not pose some type of security concern, or harbor some potential for causing climate unrest. So the question remains, if Kosilek — who was time and again diagnosed as suffering from severe gender identity disorder, and who was uniformly thought by qualified medical professionals to require surgery — is not an appropriate candidate for surgery, what inmate is?
In sum, the majority’s conclusion that the district court wrongly found that Kosi-lek satisfied the objective component of the Eighth Amendment inquiry is, in my opinion, flatly incorrect. I am no more convinced by the majority’s examination of the subjective component.
IV. Eighth Amendment: Subjective Prong
A satisfied subjective prong means that prison officials had “a sufficiently culpable state of mind” in that they showed deliber1 ate indifference to an inmate’s health and safety. Farmer, 511 U.S. at 834, 114 S.Ct. 1970; Leavitt, 645 F.3d at 497. The officials were both “aware of facts from which the inference could be drawn that a substantial risk of serious harm exists” and they drew that inference. Ruiz-Rosa v. Rullán, 485 F.3d 150, 156 (1st Cir.2007). The majority posits that the DOC, because it was faced with conflicting medical opinions about what treatment was appropriate for Kosilek, and because it proffered reasonable security concerns, was not deliberately indifferent to Kosilek’s risk for serious harm. Both theories fail to convince.
A. Conflicting Medical Opinions
The idea that incompatible medical opinions serve to insulate the DOC from a deliberate indifference finding is. a concept not advanced by the DOC, which rests on several faulty propositions and has very problematic implications.
The majority concedes that the DOC never made this particular argument, but charitably claims it is not waived because “[t]he DOC’s contention that the district court erred in deeming SRS medically necessary and in rejecting Dr. Schmidt’s approach as imprudent necessarily entails the DOC’s subjective belief that SRS was unnecessary.”[31] This is a stretch. An *108 argument advanced on appeal years after surgery was denied is not the equivalent of the DOC’s subjective belief that sex reassignment surgery was unnecessary when it denied it. Moreover, the mere existence of contradictory medical opinions does not necessarily mean that the DOC did not deny Kosilek surgery for purely pretextual reasons. It is certainly conceivable that a correctional department could seize on an opinion from a medical provider, whether or not it found it compelling, as a means to justify denying treatment.
Another even more serious flaw in the majority’s theory is that it is contradicted by the evidence. Commissioner Dennehy testified multiple times, and submitted a report to the same effect, that it was security concerns that motivated her decision to deny Kosilek surgery. During Den-nehy’s first round of testimony, when she was still claiming ignorance about whether UMass (the DOC’s contracted health-services provider) was recommending surgery, she testified that based “strictly [on] safety and security concerns” she would still veto the surgery even if UMass told her that it was medically necessary. Then, once UMass’s position that surgery was medically necessary became pellucid to Dennehy, she submitted a report to the court indicating that she was standing firm in her decision to deny surgery based on “alarming and substantial” safety and security concerns. Her final time on the stand, Dennehy testified that the only thing, in her view, preventing surgery for Kosilek was safety and security concerns; absent such concerns, Dennehy would have no reason to interfere with any medical order for treatment.
The evidence with regard to Commissioner Clarke’s stance on the issue was similar. In his report to the court, Clarke disclaimed any ability to render an opinion on the validity of the medical opinions expressed at trial, and went on to explain his view that “the safety and security concerns presented by the prospect of undertaking sex reassignment surgery for Michelle Kosilek are insurmountable.” Clarke then hammered home his security concerns on the stand. Therefore, even though there was contradictory opinions on whether surgery was medically necessary for' Kosilek, both Dennehy’s and Clarke’s decision to deny the procedure was, as they put it, based solely on security concerns.
The majority’s presumption that the existence of varying medical opinions should insulate the DOC is not only an unpre-served, unsupported argument but it has very troubling implications. It gives correctional departments serious leeway with the Eighth Amendment. If they do not want to provide a prisoner with care recommended by one or more than one medical provider, they need only find a doctor with a differing mind set (typically not a difficult task). It is no stretch to think that might be what happened here. The DOC had the treatment recommendation of Drs. Kaufman and Kapila, a local psychiatrist and psychologist who had evaluated Kosilek. The doctors themselves were recommended by the DOC’s own medical provider, UMass. Yet the DOC took the unusual step of having the Fenway doctors’ recommendation peer reviewed by Cynthia Osborne, an out-of-state social worker with a known opinion about sex reassignment surgery. It seems highly unlikely that the DOC was simply looking for a more complete picture of Kosilek’s treatment options, and that Osborne’s predictable opposition to Kosilek being provided with surgery was a non-factor. The DOC knew that Osborne was working with *109 the Virginia and Wisconsin departments of corrections to help defend lawsuits filed by transgender prisoners, and internal DOC meeting minutes noted that Osborne “may do more objective evaluations” and was “[m]ore sympathetic to DOC position.” Predictably, Osborne was one-hundred percent sympathetic.
B. Security Concerns
There is no dispute that “security considerations ... matter at prisons,” leaving “ample room for professional judgment.” Battista v. Clarke, 645 F.3d 449, 453, 454 (1st Cir.2011). “Any professional judgment that decides an issue involving conditions of confinement must embrace security and administration and not merely medical judgments.” Id. at 455 (quoting Cameron v. Tomes, 990 F.2d 14, 20 (1st Cir.1993) (emphasis in original)). But it is also true that at some point a defendant forfeits the advantage of deference, for instance following a “pattern of delays, new objections substituted for old ones, misinformation and other negatives.”[32] Id. The district court determined that the DOC had done just this, causing undue delay in Kosilek’s treatment regimen, manufacturing security concerns, and orchestrating a half-hearted security review. The record amply supported these conclusions, yet the majority too easily discounts them, especially given the deferential look this issue warrants. See, e.g., Torraco, 923 F.2d at 234 (explaining that deliberate indifference is usually a jury question); Monahan, 625 F.3d at 46 (providing that due regard is given to credibility calls); Fed. Refinance Co., 352 F.3d at 27-28 (noting that a clear error look makes sense when there are questions of motive and intent).
• Of course, it has been many years since medical providers began considering the propriety of surgery for Kosilek. Back during Kosilek I, Dr. Forstein recommended that Kosilek be allowed to consult with a surgeon who specialized in sex reassignment surgery. Then in 2003, Dr. Seil said Kosilek should be allowed to meet with a specialist after a year on hormones. But right when she started as commissioner, Dennehy made a curious move. She reassessed the care being provided to all inmates suffering from gender identity disorder, despite the DOC’s contract with UMass placing that medical care squarely in UMass’s purview. Then once the Fen-way doctors opined in 2005 that Kosilek should be allowed to have surgery, the DOC frittered away time claiming not to understand that UMass recommended surgery for Kosilek. The majority does not quibble with the court’s finding that the DOC prevaricated in this respect because it “does not undercut the consistency with which they identified safety and security concerns.” This misses the point. To establish a subjective intent, “it is enough for the prisoner to show a wanton disregard sufficiently evidenced ‘by denial, delay, or interference with prescribed health care.’ ” Battista, 645 F.3d at 453 (quoting DesRosiers, 949 F.2d at 19); see also Johnson v. Wright, 412 F.3d 398, 404 (2d Cir.2005) (A “deliberate indifference claim can lie where prison officials deliberately ignore the medical recommendations of a prison *110 er’s treating physicians.”). That is precisely what the district court found happened here, and the evidentiary support for this determination is in the record.
The same goes for the court’s conclusion that the DOC’s security reviews were rushed and results-driven. Dennehy told a news outlet that the DOC would deny Kosilek’s request for surgery despite only having “generalized discussions” and phone calls with the relevant players; she had not yet received written reports or convened a formal security meeting. When the DOC did meet, there was just a week left before its court-ordered security report was due — a report that was then penned predominantly by trial counsel and reviewed by Dennehy only a day or two before its filing. Once trial was underway, the hurriedness continued. A mere nine days before expert disclosures were due, Dennehy contacted the director of the Federal Bureau of Prisons looking for a security expert. And the experts the DOC ultimately did present at trial seemed ill prepared, failing to take into account important details about Kosilek’s medical and disciplinary history.
For the district court, another reason not to esteem the DOC’s proffered security concerns was the fact that they were “largely false” and “greatly exaggerated.” This finding is not clearly erroneous. Yet the majority easily dismisses it, in part by limiting its focus to what it presumably perceives as the DOC’s more valid security concerns — where to house Kosilek postop-eratively and the deterrence of false suicide threats by inmates. The majority is conveniently forgetting the throw-it-up- and-see-what-sticks approach taken by the DOC below. It was this approach, in part, that led the court to question whether the DOC could be trusted to give an accurate picture of security concerns consequent to surgery.
For instance, the DOC repeatedly claimed that transporting Kosilek to surgery out of state would pose an insurmountable security risk. It is hardly surprising the district court thought this was an embellished concern. Kosilek had been transported to multiple doctor’s appointments without issue, and it is illogical to think Kosilek would attempt to flee en route to the surgery she has dedicated decades of her life to obtaining. Also eminently unlikely is that during the transport home from highly invasive surgery, a sixty-five-year-old, recovering Kosilek would be able to escape the grasp of DOC personnel. Even Clarke thought it near certain that Kosilek could safely be transported to and from surgery.
With regard to housing Kosilek in a female prison, the DOC painted Kosilek as a highly-polarizing escape risk who could not possibly safely reside in MCI-Fram-ingham’s general population. It pointed to the comparatively weaker perimeter of MCI-Framingham, alleging that Kosilek’s superior male strength and life sentence made her a flight risk. One can easily see why the district court was not buying this. Kosilek was advanced in age, physically slight, had taken female hormones for years, and had an excellent disciplinary record. And MCI-Framingham successfully housed approximately forty life offenders. The court also had reason to be skeptical of the DOC’s adamant contention that Kosilek would cause inmate climate issues at MCI-Framingham due to the fact that she murdered her wife. Undoubtedly inmates find other inmates offensive for a plethora of reasons, such as, race, religion, gang affiliation, sexual orientation, or the crime committed. Prisons deal with these situations on a routine basis and the evidence established that MCI-Framingham had procedures in place to do just that.
*111 The DOC even admitted at oral argument that had a postoperative, transgender person out in free society committed murder, the DOC would have to figure out where to house that person. The DOC; however, did not think this a particularly important point, protesting that Kosilek presents unique concerns that separate her from this hypothetical inmate. I am unmoved. The fact that Kosilek’s crime was one of violence against a woman could equally apply to another potential inmate. And the fact that Kosilek gained notoriety by litigating against the DOC all these years — in other words, successfully pursuing her constitutional right to adequate medical care — hardly seems a compelling consideration.
For the district court, also blunting the DOC’s fervent cries of overwhelming security concerns were the alternatives to placing Kosilek in the general population of a Massachusetts prison. There was the option of transferring Kosilek to an out-of-state prison (though this scenario appears to have been left largely unexplored by the DOC). In fact, the evidence established that Clarke’s former employer, the Washington Department of Corrections, housed a post-operative female transgender inmate, also serving a life sentence for murdering a female relative, without security or climate issues. The inmate’s housing was so unremarkable that Clarke was not even aware of it during his tenure in Washington. Further, there was evidence that Kosilek’s safety could be ensured by placing her in a segregated housing unit.
The DOC’s past conduct was also relevant to the district court’s credibility assessment. In connection with Kosilek /, then Commissioner Michael Maloney hammered the serious security concerns surrounding Kosilek remaining at MCI-Norfolk while receiving hormones, theorizing that an inmate living as a female (with female attributes) among sex offenders would create a risk of violence. However, once the DOC actually stopped to conduct a security review, it determined' there were no current security concerns with Kosilek being provided estrogen therapy. Indeed no security issues ever arose. Ko-silek has been safely housed at MCI-Norfolk for many years presenting herself as female. The DOC’s reversal on this issue calls into question its stance before this court about the non-feasibility of housing a post-surgical Kosilek at MCI-Norfolk.
The DOC also expressed concern that providing Kosilek with surgery would encourage inmates to utilize suicide threats to receive a desired benefit, and the majority deems this concern reasonable. I am not convinced, and neither was the district court. Not only is there absolutely no evidence that Kosilek is trying to game the system, but the DOC, as it emphasized at trial, employs mental health professionals and has policies in place to deal with sui-cidality. Presumably, these tools can be used by the DOC to assess whether an inmate’s particular suicide threat is manufactured or real, and it can be dealt with accordingly. That the DOC does not want to be inundated with a hypothetical influx of false suicide threats hardly seems a valid reason to deny a prisoner care deemed medically necessary.
For the district court, the public and political disapproval of Kosilek’s surgical pursuit was another factor. It did not believe Dennehy’s and Clarke’s claims that the avoidance of controversy played no role in the DOC’s decision to deny surgery. The majority concedes that it must give deference to the court’s finding that Den-nehy’s motivations were colored by public pressure and so, instead, the majority hypes up the role of Commissioner Clarke by characterizing him as the ultimate deci *112 sion maker. I see a few flaws with the majority’s reasoning.
For one, the majority says the district court improperly imputed .Dennehy’s motivations to Clarke, thus ignoring the injunc-tive-relief requirement that it take into account the DOC’s then present-day stance.[33] See Farmer, 511 U.S. at 845, 114 S.Ct. 1970 (quoting Helling, 509 U.S. at 36, 113 S.Ct. 2475) (The court considers deliberate indifference “ ‘in light of the prison authorities’ current attitudes and conduct,’ ... their attitudes and conduct at the time suit is brought and persisting thereafter.”). The majority has it wrong. The court took testimony from Clarke, reviewed his written report, and spoke extensively in its decision about why it was not convinced that Clarke denied Kosilek surgery based on legitimate penological concerns. Of note, it was Kosilek who sought to have Clarke inform the court of his position, and the DOC, which stipulated at trial that Dennehy was the operative decision maker, actually objected to Clarke even testifying as he was simply “maintain[ing] the position set forth by the DOC through former Commissioner Dennehy.”
Furthermore, though the majority defers to the court’s take on Dennehy, it refuses to do so for Clarke, claiming that “Clarke was never found by the court to be non-credible.” This is not entirely accurate. Clearly the import of the court’s conclusion that Clarke’s articulated security concerns were either false or exaggerated as a pretext to deny surgery means that the court did not think Clarke a completely credible witness. See Kosilek, 889 F.Supp.2d at 241 (“[T]he purported security considerations that Dennehy and Clarke claim motivated their decisions to deny Kosilek sex reassignment surgery are largely false and any possible genuine concerns have been greatly exaggerated to provide a pretext for denying the prescribed treatment.”) In fact, the court specifically found certain claims made by Clarke not to be credible. See id. at 244 (finding that “neither Dennehy nor Clarke has provided a credible explanation for their purported belief that if Kosilek’s genitalia are altered the risk to him and others at MCI Norfolk will be materially magnified” and “[t]he claims of Dennehy and Clarke that they have denied sex reassignment surgery for Kosilek in part because MCI Framingham is not sufficiently secure to prevent an escape by Kosilek, who has never attempted to flee, are not credible.”) Therefore, as it did with Dennehy, the majority should be giving due regard to the court’s conclusion that Clarke was not believable.
The majority also misses the mark with its contention that the “only evidence” tending to show Clarke may have considered public and political criticism were the two letters from the unhappy Massachusetts legislators. This is not the whole picture. In addition to the letters, what convinced the court that Clarke was improperly motivated was his advancing inflated security concerns following a hasty review, suggesting that he did not operate with an open mind. Having already de *113 tailed the evidence supporting the court’s distrust of the DOC’s proffered security concerns, I will not rehash.
As for the thoroughness of Clarke’s review, the court criticized Clarke for not consulting with .Luis Spencer, who was Superintendent of MCI-Norfolk at the time, and for not reviewing the DOC’s security-expert trial testimony, prior to deciding whether to deny surgery. The DOC counters that Clarke, pursuant to the court’s order, was not required to do either of those things. It is both conceivable that Clarke’s review was too cursory, or that he felt constrained by the court’s order, though the fact that Clarke did not know significant details such as Kosilek’s age and excellent disciplinary record favors the former possibility. Either way, both views are permissible, which means that the district court’s choice of one of them cannot be clearly erroneous. See Monahan, 625 F.3d at 46. Nor is it appropriate for us to second-guess the court’s tenable perception of Clarke’s motivations, as deference extends to “inferences drawn from the underlying facts, and if the trial court’s reading of the record [with respect to an actor’s motivation] is plausible, appellate review is at an end.” Janeiro, 457 F.3d at 138-39 (internal quotation marks omitted) (alteration in original).
Ultimately, there was adequate eviden-tiary support for the court’s determination that the DOC was deliberately indifferent. The court did not obviously err in concluding the DOC delayed implementing medical treatment recommended by its own providers, sought out a more favorable medical opinion, engaged in a hasty, result-driven security review, offered a host of poorly thought out security concerns, and then denied surgery based not on any legitimate penological concerns but on a fear of controversy. Whether I, or any of my colleagues, would have drawn these same conclusions had we been presiding over this trial is irrelevant; our review is circumscribed. It is enough that the district court had a reasonable basis for’ its judgment. The district court’s determination that the Eighth Amendment’s subjective prong was satisfied should stand.
V. Conclusion
I am confident that I would not need to pen this dissent, over twenty years after Kosilek’s quest for constitutionally adequate medical care began, were she not seeking a treatment that many see as strange or immoral. Prejudice and fear of the unfamiliar have undoubtedly played a role in this matter’s protraction. Whether today’s decision brings this case to a close, I cannot say. But I am confident that this decision will not stand the test of time, ultimately being shelved with the likes of Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), deeming constitutional state laws requiring racial segregation, and Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944), finding constitutional the internment of Japanese-Americans in camps during World War II. I only hope that day is not far in the future, for the precedent the majority creates is damaging. It paves the way for unprincipled grants of en banc relief, decimates the deference paid to a trial judge following a bench trial, aggrieves an already marginalized community, and enables correctional systems to farther postpone their adjustment to the crumbling gender binary.
I respectfully dissent.

. The majority’s decision to give little deference to the district court is undoubtedly a boon to the DOC, and given the DOC's garbled treatment of the standard of review issue on appeal, it is a downright windfall. In violation of our rules, the DOC did not include a standard of review in its opening brief. See Fed. R.App. P. 28(a)(8)(B). In its reply brief, the DOC gave us a bit more, arguing that the appropriateness of medical care called for de novo review but neglecting to indicate what scrutiny a deliberate indifference finding necessitated. In its petition for en banc review, the DOC's position continued to evolve. It contended that a heightened standard of review should be applied because this case involves intertwined issues of law and fact.

. The majority also relies on United States v. Bajakajian, 524 U.S. 321, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998), an Eighth Amendment excessive punishment and fines case, for the same proposition it cites Ornelas for. Specifically, the majority states that in Bajakajian, the Supreme Court reasoned that the " 'application of a constitutional standard to the facts of a particular case' ... may appropriately require de novo appellate review to ensure consistency in the law's development." Baja-kajian does not say this. The Court there did not address the concept of consistency of the law; it simply cited Ornelas for the narrower *100 proposition that de novo review attaches to the issue of whether a fine is constitutionally excessive. See id. at 336, n. 10, 118 S.Ct. 2028. For that reason I focus on Ornelas.

. Indeed the majority dedicates over thirty pages of its opinion to the factual and procedural background in this case. This is not surprising; those facts are integral to the resolution of the constitutional question. What is surprising is the majority’s failure to see the significance of the factually concentrated nature of this case.

. Plus, even assuming that the conclusion that the DOC’s refusal to provide care constituted an Eighth Amendment violation lands closer to the law side of the mixed-question spectrum, a measure of deference is still appropriate. See Battista v. Clarke, 645 F.3d 449, 454 (1st Cir.2011) ("The legal labels applied to facts are reviewed on appeal more closely than a district court fact-finding, but often with some deference to the district judge.").

.Of course the majority then goes on to explain why the court’s adverse credibility determination does not matter, a point I will get into later.

. The Standards state: “Clinical departures from these guidelines may come about because of a patient's unique anatomic, social, or psychological situation, an experienced *103 professional’s evolving method of handling a common situation, or a research protocol.” Standards of Care, Version 6, at 2.

. The majority makes much of the district judge faulting Dr. Schmidt for not writing letters of recommendation for patients seeking sex reassignment surgery, suggesting that the judge did not appreciate the nuance between opening the door for surgery and advocating for it. I suspect the judge was more broadly concerned with the fact that Dr. Schmidt did not think sex reassignment was ever medically necessary, nor had he ever seen a case where it was warranted. And despite having this strident perspective, Dr. Schmidt nonetheless opened the door for patients to undergo this major medical procedure.

. The majority mentions that none of the experts who opined that Kosilek completed a real-life experience considered that she might be housed in a female facility post-surgeiy. This is hardly surprising as this is a theory of my colleagues' own making. The DOC never made any argument that a potential post-surgery housing change rendered Kosilek unable to complete the real-life experience, nor did any provider opine that it was even a consideration.

. The Seventh Version of the Standards of Care came out in 2011. Notably it contains a new section devoted to scenarios where persons with gender identity disorder are living in institutional environments such as prisons or long-term care facilities. Standards of Care, Version 7, at 67. It provides that those individuals’ health care "should mirror that which would be available to them if they were living in a non-institutional setting” and that "[a]ll elements of assessment and treatment as described in the [Standards of Care] can be provided to people living in institutions.” Id.

.Court-appointed expert, Dr. Stephen Levine, ultimately testified that from a purely medical perspective (absent considerations relative to the prison environment), a prudent professional would not deny Kosilek sex reassignment surgery. However, Dr. Levine initially opined that Dr. Schmidt's view was reasonable (if not popular), a discrepancy that apparently arose from Dr. Levine disregarding the district court's order to treat Kosilek as a patient in free society. Considering this incongruity, I do not list Dr. Levine as one of Dr. Schmidt’s critics.

. The court found Kosilek testified credibly that although hormone treatments had helped, she was distressed by her male genitalia and believed that she needed surgery. Antidepressants and psychotherapy, according to Kosilek, would not alter the fact that she did not want to continue living with her male genitalia.

. When the DOC first informed the district court that it would not be providing Kosilek with surgery (back in June 2005 under Den-nehy's watch), Dr. Schmidt had not even evaluated Kosilek let alone communicated his findings. At the time, the DOC was only armed with the report of Cynthia Osborne *108 who had not met with Kosilek but rather had simply peer reviewed the Fenway Report.

. The pattern in Battista — a case in which a transgender inmate sued the Massachusetts DOC for failing to provide doctor-recommended hormones — included an initial failure to take the inmate’s diagnosis and hormone request seriously, the years it took for a solid security justification to be made, and the DOC’s claim that withholding hormones or placing the inmate in severely constraining protective custody were the only two options. In other words, there are some marked similarities between that case and this one. That is, apart from their outcomes. In Battista, this court affirmed the district court's deliberate indifference determination.

. While a defendant’s attitudes and conduct at the time a decision is rendered are relevant, what motivates the DOC today is not. This fact may be less than clear given the majority’s reference to the DOC’s present stance ("proof that the DOC remains motivated by pretextual or improper concerns”) and the fact that Dennehy is now seven years removed from the decision-making process. To be clear, we are reviewing the district court’s decision that the DOC, through Den-nehy and Clarke, denied Kosilek surgery based on pretextual reasons. Indeed it would be an amazing feat of prescience for the district court to anticipate what the DOC’s viewpoint would be two years after penning its decision.